IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 33654

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, May 2007 Term |
| | ) | |
| v. | ) | 2007 Opinion No. 101 |
| | ) | |
| WILLIAM O. FIELD, | ) | Filed: July 31, 2007 |
| | ) | |
| Defendant-Appellant. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| | ) | |

Appeal from the District Court of the Sixth Judicial District, State of Idaho, Bannock County. Honorable Peter D. McDermott, District Judge.

Judgment of conviction and sentence for lewd conduct and sexual battery, reversed and remanded for new trials.

Nevin, Benjamin & McKay, LLP, Boise, for appellant. Dennis Alan Benjamin argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. Jessica Marie Lorello, Deputy Attorney General, argued.

_____

BURDICK, Justice

Appellant William O. Field was convicted of lewd conduct and sexual battery. Field asks us to reverse and asserts several errors were committed below including improper joinder of the two offenses for trial, the introduction of inadmissible evidence, prosecutorial misconduct, and the giving of erroneous jury instructions. We reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In September 2003, a seven year old girl, H.P., was staying at the house of a family friend, Appellant William O. Field, while her mother was working out of town. According to H.P., one night during her stay she went outside to get ice cream from the garage while Field was sitting on a chair on the porch. Field asked her to sit on his lap, and she complied. He began to rub her stomach underneath her clothing and then put his hand underneath her underwear and

1

digitally penetrated her vagina. H.P. told Field she needed to go to bed and left the porch. The next day H.P. went to school and then spent another night at the Field's home. After school the next day, her father picked her up and took her to her mother's house. After H.P. returned home, she seemed upset and her eleven year old sister, S.P., went into H.P.'s room to ask her what was wrong. At first H.P. refused to answer, but eventually she told S.P. that while at Field's house he touched her in her "privatal [sic] area." S.P. then insisted that H.P. tell their mother (mother) what happened. SP then brought H.P. to the mother and told the mother that H.P. had something to tell her. After H.P. described what happened, the mother phoned the police. In September 2003 the State filed a complaint against Field for lewd conduct with a child under sixteen, I.C. § 18-1508.

After the complaint was filed, Field made a phone call to T.B. and offered to pay her for names of the mother's old boyfriends. T.B. went to the police and told them about Field's phone call and about an incident that occurred between Field and T.B. in 2001. T.B. agreed to make recorded phone calls to Field asking him about the incident.

According to T.B., in late October and early November of 2001, when she was seventeen years old, she and her eighteen year old friend Kayln Anderson were house-sitting and babysitting Field's stepdaughter, A.C. During one of the nights T.B. was there, Field returned home unexpectedly. On that evening, Field called the house phone and asked that A.C. go to the basement to speak with him. Subsequently, A.C. received a phone call and T.B. went downstairs to give A.C. the phone. When T.B. entered the basement, A.C. who had been lying next to Field in bed, "popped up real quick [and] grabbed the phone. . . ." Field then asked T.B. to lie next to him and he offered to give her a back rub. As he was giving her a back rub he made comments "like [she] was beautiful . . . [and] he liked touching [her]," began kissing her, and then put his hand underneath her clothing and rubbed her whole buttocks. T.B. told Field she had homework to do and went upstairs. Field then called the house phone and asked T.B. if she needed anything to which she replied she did not. The next morning she noticed there was a ten dollar bill on her book bag. In October 2003 the State filed a complaint against Field for sexual battery of a minor child sixteen or seventeen years of age, I.C. § 18-1508A(1)(c).

Over Field's objection, the district court granted the State's motion to join the offenses for trial. A trial was held, in which the jury convicted Field of Lewd Conduct with a Child Under Sixteen, I.C. § 18-1508, and Sexual Battery of a Minor Child, I.C. § 18-1508A(1)(c).

2

The district court denied Field's motion for a new trial. The district court sentenced Field to a fifteen year fixed period of confinement and an indeterminate twenty year period on the lewd conduct conviction and to a five year fixed period of confinement and an indeterminate ten year period on the sexual battery charge. The sentences were to run concurrently. The Idaho Court of Appeals reversed Field's lewd conduct conviction, but concluded that the errors were harmless as to Field's sexual battery conviction. We granted the parties' cross-petitions for review.

## II. STANDARD OF REVIEW

"When considering a case on review from the Court of Appeals, this Court gives serious consideration to the views of the Court of Appeals; however, this Court reviews the trial court's decisions directly and acts as though it is hearing the matter on direct appeal from the decision of the trial court." *State v. Robinett*, 141 Idaho 110, 111-12, 106 P.3d 436, 437-38 (2005) (citations omitted).

The trial court's decision to admit evidence is reviewed on an abuse of discretion standard. *Id*. at 112, 106 P.3d at 438 (citation omitted).

## III. ANALYSIS

Field argues that both convictions should be reversed due to the many errors committed below. The alleged errors include wrongful joinder of the two offenses for trial, the admission of H.P.'s out of court statements, the introduction of Anderson's "bad acts" testimony, and prosecutorial misconduct. Field contends that these actions constituted harmful or cumulative error and thus, mandate reversal of his convictions. Field also asserts that the reasonable doubt jury instruction was erroneous. Finally, Field argues that the sentences imposed upon him by the district court were unreasonable. We will address each issue in turn.

### A. Joinder

The State moved to join the two offenses "on the grounds and for the reasons that both cases are connected together or constitute a common scheme or plan." The district court granted the motion after a hearing and after reviewing the parties' subsequent submission of briefs on the motion. Field argues joinder was improper because the facts surrounding the two offenses are insufficient to show a common scheme or plan.

Whether a court improperly joined offenses pursuant to I.C.R. 8 is a question of law, over which this Court exercises free review. *See State v. Anderson*, 138 Idaho 359, 361, 63 P.3d 485, 487 (Ct. App. 2003); *see also United States v. Lane*, 474 U.S. 438, 449 n.12 (1986) (adopting a

3

free review standard for joinder pursuant to Fed. R. Crim. Pro. 8(b)). In contrast, an abuse of discretion standard is applied when reviewing the denial of a motion to sever joinder pursuant to I.C.R. 14; however, that rule presumes joinder was proper in the first place.[1] *Anderson*, 138 Idaho at 361, 63 P.3d at 487; *see also Lane*, 474 U.S. at 449 n.12. As we are reviewing the propriety of the initial joinder, we exercise free review.

The State argues joinder was appropriate because the two offenses were connected together and constituted parts of a common scheme or plan. The State first argues that the offenses are connected together because Field involved T.B. in his case concerning H.P. by contacting T.B. and soliciting her help. The State then argues "taking advantage of underage females who come into your home to babysit or to be babysat" is a common scheme or plan.[2]

Joinder of offenses is permissible if those offenses "could have been joined in a single complaint, indictment or information." I.C.R. 13. Two or more offenses may be charged on the same complaint, indictment or information when the offenses charged "are based on the same act or transaction or on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan." I.C.R. 8(a). Whether joinder is proper is "determined by what is alleged, not what the proof eventually shows."[3] *State v. Cochran*, 97 Idaho 71, 73, 539 P.2d 999, 1001 (1975).

---

[1] Idaho Criminal Rules 14 states in pertinent part:

> Relief from prejudicial joinder.—If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in a complaint, indictment or information or by such joinder for trial together, the court may order the state to elect between counts, grant separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires.

[2] The State also argues that joinder is proper because T.B.'s testimony would have been admissible in H.P.'s case. However, whether evidence would have been admissible absent the joinder is only a factor in determining whether a proper joinder is prejudicial and not whether joinder is proper in the first place. *State v. Abel*, 104 Idaho 865, 869, 664 P.2d 772, 776 (1983). Furthermore, we note that while T.B. may have been able to testify that Field offered her money for information that might help him in his trial for the lewd conduct offense, a judge likely may have excluded T.B.'s testimony regarding Field's sexual misconduct pursuant to evidence rules, such as I.R.E. 403 or I.R.E. 404b.

[3] Field argues that in order to determine what is "alleged" the Court should look exclusively to the charging document and no other evidence. That proposition is not supported by *Schaffer v. United States*, 362 U.S. 511, 514 (1960), which is the only case Field cites. In that case the original charging document joined both defendants; though the Court found the allegations of the document met the provisions of F.R.C.P. 8(b) it did not make any general statement limiting the review of allegations to the face of the charging document. When we have reviewed the propriety of joinder we have not limited the review to allegations in the charging document. *See Cochran*, 97 Idaho at 73, 539 P.2d at 1001 (holding the district court did not err when it joined offenses and that the conclusion that the allegations show the offenses are part of a connected series of act "is supported by the *record*." (emphasis added)).

Cases discussing common plans have focused on whether the offenses were one continuing action or whether the offenses have sufficient common elements including the type of sexual abuse, the circumstances under which the abuse occurred, and the age of the victims. For example, in *State v. Estes*, 111 Idaho 423, 424, 725 P.2d 128, 129 (1986), the victim testified that Estes entered her hotel room and forcibly raped her four times. Estes argued that because each of those acts constituted separate rape, he should have been charged in four separate counts. *Id.* at 427, 725 P.2d at 132. The Court held that joinder of the offenses was proper because they were part of one continuing action—the individual sexual penetrations were not committed at different times, in different places, nor with different actors or circumstances. *Id.*

In *State v. Schwartzmiller*, 107 Idaho 89, 91, 685 P.2d 830, 832 (1984), Schwartzmiller was convicted of three counts of lewd and lascivious conduct which took place in late 1978 with two fourteen year old boys. Although the acts occurred at different times and with different people, the Court held the counts were properly joined because the facts demonstrated a common plan. Schwartzmiller frequented areas where young boys may be found, befriended boys with no father figure in the home, enticed them from their homes, lowered their natural inhibitions through the use of drugs and alcohol, and committed sex acts upon them. *Id.* at 93, 685 P.2d at 834.

There are also cases which discuss whether evidence regarding other sex crimes would be admissible in a trial to prove a common plan. *See, e.g.*, *State v. Phillips*, 123 Idaho 178, 181, 845 P.2d 1211, 1214 (1993) (possible common plan when three individuals testified that when they were minors and friends of Phillips's daughters, he invited them into his garage to view pornographic materials and touched them in inappropriate areas); *State v. Moore*, 120 Idaho 743, 747, 819 P.2d 1143, 1147 (1991) (possible plan or scheme even though offenses were years apart because sexual abuse of three individuals occurred at approximately the same age for each girl, and opportunity to enact plan occurred "only when there was a minor female present in [defendant's] home and when she reached an appropriate age for [defendant's] designs"); *State v. Longoria*, 133 Idaho 819, 825, 992 P.2d 1219, 1225 (Ct. App. 1999) (common plan to exploit and sexually abuse an identifiable group of young female victims—girls of similar age, spending the night with his daughters, whom he abused late at night).

In this case, the facts do not show that the separate offenses are connected together or that there is a common scheme or plan. First, the offenses are not transactions that are connected

together. The State argues the connection lies in the fact that after being charged with the offense against H.P., Field called T.B. for information about H.P.'s mother, which resulted in T.B.'s decision to report that Field had committed a prior offense against her as well. However, the offenses must be "*based* on the same act or transaction or on two (2) or more acts or transactions connected together." I.C.R. 8(a) (emphasis added). The phone call was made after both offenses had already occurred, thus, it could not have been a transaction serving as the basis for Field committing the offenses.

Second, there is no common scheme or plan. The State argued below that the offenses constitute a common scheme because Field asked the individual girls to come near him, began to "innocently" touch them and then put his hand down their pants. Additionally, the State argues on appeal that Field had a plan to take advantage of underage girls that come into his home to babysit or be babysat. We disagree; the incidents occurred at different times, under different circumstances, and involved different parties with significantly different ages.

The first offense was committed against a seven year old girl, H.P., in 2003. H.P.'s mother arranged for H.P. to stay temporarily with the Fields. H.P. testified that Field asked her to sit on his lap, she complied, and that he began to rub her stomach underneath her clothing, put his hand underneath her underwear and "put his finger inside of [her] private." The second offense was committed against a seventeen year old girl, T.B., in 2001. T.B. testified that she and her friend, Kayln Anderson, were asked to housesit and watch over Field's stepdaughter, A.C. while the Fields were out of town. A.C. was downstairs with Field and when T.B. went downstairs to tell A.C. she had a phone call, A.C. went upstairs. Field then asked T.B. to lie down on the bed next to him so that he could give her a back rub. As Field was rubbing her back, he also began to kiss her and say things like "he liked touching [her]" and "[her] skin was soft." T.B. testified that he put his hand inside her underwear and rubbed her entire buttocks.

These separate acts did not constitute part of a common scheme or plan. There is nothing to show that at the time Field committed the offense against T.B. he had a plan to also commit an offense against H.P. specifically, or to commit an offense against someone he would be "babysitting" two years later. The offenses were not part of one continuing action against a single individual as in *Estes*, and do not contain the striking similarities found in *Schwartzmiller*. T.B. and H.P., though both minors, had different ages (one was a young child, the other was almost an adult), the type of sexual contact was different (digital vaginal penetration and the

6

rubbing of buttocks), and the incidents occurred two years apart. The similarities that both girls were only temporarily in the household, that the acts occurred in Field's home, and that the abuse began with "innocent" touching are insufficient to prove a common scheme or plan. Thus, we hold that in this case the joinder of the offenses was erroneous.

## B. Out of Court Statements

Field argues it was error to introduce two out of court statements H.P. made to her sister and mother. Over objection, H.P.'s sister, S.P., testified that H.P. seemed upset, and that S.P. asked H.P. what "was up." S.P. then testified that H.P. answered she did not want to say what was wrong, and that S.P. asked again that H.P. tell her what was wrong. H.P. answered "that Bill Field had touched her in her privatal [sic] area." Also over objection, H.P.'s mother, testified that H.P. told her Field asked H.P. to sit on his lap and that "he put his finger in my hole." The State argues that the statements were properly admitted either because they were not hearsay, they fell under the I.R.E. 803(24) catch-all exception, or because they fell under the I.R.E. 803(2) excited utterance exception. We hold the statements were inadmissible.

Originally, the State argued the statements were not hearsay because they were not introduced to prove the truth of the matter asserted, only to show the effect on listener—that the statement to S.P led to making statements to H.P.'s mother which led to a police report. However, the State has never shown that the exact statements prompting the mother to call the police are relevant—of consequence to determining whether Field's guilt is more or less probable. *See* I.R.E. 402. Thus, they were not properly admitted on those grounds.[4]

The State also argues that the Court can affirm the admission of H.P.'s out of court statements to her sister and mother on the alternative basis that the statements could have been admitted under I.R.E. 803(24), the "catch-all" exception to the hearsay rule. The State insists the Court can uphold the admission of the statements pursuant to the rule even though the district court did not make the necessary factual findings and urges the Court to overrule *State v. Horsley*, 117 Idaho 920, 792 P.2d 945 (1990). In *Horsley*, this Court declined to uphold the admission of hearsay pursuant to I.R.E. 803(24) when the trial court did not specifically find that

---

[4] Evidence is not admissible if it is not relevant. I.R.E. 402. "'Relevant Evidence' means evidence having any tendency to make the existence of any fact *that is of consequence to the determination* of the action more probable or less probable than it would be without the evidence." I.R.E. 401 (emphasis added).

the five requirements necessary to admit statements under that exception were satisfied. *Horsley*, 117 Idaho at 928, 792 P.2d at 953. The Court noted that:

> While we are prepared to defer to the discretion of the trial courts in the admission of evidence, we are not prepared to endorse the exercise of discretion to admit evidence under I.R.E. 803(24) unless the trial court makes specific findings that each of the five requirements of the rule have been satisfied. Otherwise, we will not be able to determine whether the trial court considered all of the requirements that must be met before evidence is admitted under I.R.E. 803(24) and properly exercised its discretion in admitting the evidence.

*Id.* at 928, 792 P.2d at 953.

We continue to follow *Horsley* and thus decline to uphold the admission of H.P.'s out of court statements pursuant to I.R.E. 803(24) since the district court did not specifically find that the five requirements were met.[5]

Finally, the State asserts that the statements were admissible pursuant to the excited utterance exception. The admission of a statement as an excited utterance is within the sound discretion of the trial court. *State v. Bingham*, 116 Idaho 415, 421, 776 P.2d 424, 430 (1989); *State v. Parker*, 112 Idaho 1, 4, 730 P.2d 921, 924 (1986). Abuse of discretion is determined by a three part test which asks whether the district court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) reached its decision by an exercise of reason." *Sun Valley Potato Growers, Inc. v. Texas Refinery Corp.*, 139 Idaho 761, 765, 86 P.3d 475, 479 (2004) (citations omitted).

The court's decision denying Field's motion for a new trial shows that it correctly perceived the issue as one of discretion and that it reached its decision by an exercise of reason. However, we hold the court abused its discretion because it did not act consistently with legal standards.

Statements are not excluded by the hearsay rule when the statements "relat[e] to a startling event or condition made while the declarant was under the stress of the excitement caused by the event or condition." I.R.E. 803(2). The exception has two requirements: (1) an occurrence or event sufficiently startling to render inoperative the normal reflective thought

---

[5] The State asks for remand to the district court to make the appropriate findings. However, to remand for findings would be inconsistent with *Horsley*. In that case we concluded that since neither the magistrate nor the district court made the necessary findings for admission of evidence under I.R.E. 803(24), we "had no alternative but to reverse the decision of the district judge." *Horsley*, 117 Idaho at 929, 792 P.2d at 954.

process of an observer; and (2) the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought. *Parker*, 112 Idaho at 4, 730 P.2d at 924 (quoting E. Cleary, *McCormick on Evidence*, § 297 (3d ed. 1984)). We consider the totality of the circumstances including: "the amount of time that elapsed between the startling event and the statement, the nature of the condition or event, the age and condition of the declarant, the presence or absence of self-interest, and whether the statement was volunteered or made in response to a question." *State v. Hansen*, 133 Idaho 323, 325, 986 P.2d 346, 348 (Ct. App. 1999) (citing 31 Michael H. Graham, *Federal Practice and Procedure* § 6753, at 275-76 (Interim ed. 1997)).

Certainly H.P. meets the first requirement of the excited utterance exception in that she experienced an event sufficiently startling to render inoperative her normal thought process. We have noted that "[a] sexual assault is one of the most distressing experiences a person could have." *Parker*, 112 Idaho at 4, 730 P.2d at 924. The issue is, then, whether statements made to her mother and sister two days later can be considered a spontaneous reaction to the event and not the result of reflective thought.

We have held that the passing of several days between the event or condition and the time of the declarant's statement is too long to qualify as an excited utterance. *State v. Zimmerman*, 121 Idaho 971, 975-76, 829 P.2d 861, 865-66 (1992). In that case, the police officer testified that after he arrived at the victim's home, the victim ran upstairs and yelled, "No. I'm not going to tell my dad's secret. You tell him." *Id*. at 975, 829 P.2d at 865. In that case the sexual abuse occurred between November 15-27, but the statement at issue was made by the five year old victim on December 2. *Id*. at 975, 829 P.2d at 865. We held that the length of time between the statement and the abuse was too long to be considered an excited utterance. *Id*. at 975-76, 829 P.2d at 865-66.

Considering the totality of the circumstances, we hold that H.P.'s statements were not properly admitted under the excited hearsay exception. Two days had passed between the incident and the statements, the statements were not volunteered and in this case, H.P.'s initial refusal to speak about the incident to her sister tends to show that when she finally did the statements were a result of reflective thought. Therefore, because the statements were hearsay and no exception to the general hearsay rule applies, we hold the admission of H.P.'s out of court statements to her sister and mother was error.

9

**C. Bad Acts Testimony**

Field argues that testimony by Anderson regarding comments of a sexual nature Field made to her in the past and the morning after the alleged sexual battery Field committed upon T.B. was improper bad acts testimony because it did not show a common scheme or plan. During a pretrial hearing, the district court ruled that the State would be allowed to ask Anderson questions regarding various inappropriate or lewd comments Field had made to her and found that the probative value of the evidence was not outweighed by unfair prejudice. The court stated the evidence would be admitted to "show common scheme or plan or absence of mistake or inadvertence" but not to show Field committed the crime he is charged with.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of person to show that he committed the crime for which he is on trial. I.R.E. 404(b); *Moore*, 120 Idaho at 745, 819 P.2d at 1145. Nonetheless, such acts may be admissible for other purposes, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ." I.R.E. 404(b). Admissibility of misconduct evidence is determined using a two-tiered analysis. *Moore*, 120 Idaho at 745, 819 P.2d at 1145. First, the court must determine that the evidence is relevant to a material and disputed issue concerning the crime charged. *Id*. Whether the evidence is relevant is a matter of law and is subject to free review. *State v. Labelle*, 126 Idaho 564, 567, 887 P.2d 1071, 1074 (1995). Second, the court must determine that the probative value of the evidence is outweighed by the danger of unfair prejudice to the defendant. *Moore*, 120 Idaho at 745, 819 P.2d at 1145. The balancing of the probative value and unfair prejudice of the evidence is within the discretion of the trial judge. *Id*.

In *Moore*, the defendant was charged with lewd conduct involving his granddaughter when she was six or seven years old. 120 Idaho at 744, 819 P.2d at 1144. The State sought to introduce evidence that Moore had engaged in similar uncharged sexual misconduct with his stepdaughter, when she was between the ages of five and nine, and daughter, when she was between the ages of nine and thirteen. *Id*. This Court held testimony of the other sexual misconduct "demonstrate[d] Moore's general plan to exploit and sexually abuse an identifiable group of young female victims." *Id*. at 745, 819 P.2d at 1145. The Court held the testimony was relevant "to the issue of credibility and corroboration of the victim's testimony" and noted that corroboration is often necessary in sex crime cases involving young victims in order to establish the credibility of the young child. *Id*.

10

Idaho cases affirming the use of bad acts evidence in sexual misconduct cases focus on prior conduct that was actual sexual abuse and that was either similar abuse or involved victims of similar ages to those abused. *See generally Labelle*, 126 Idaho at 567, 887 P.2d at 1074 (testimony of sexual molestation relevant when at the time the girls were similar in age to victim); *Phillips*, 123 Idaho at 181, 845 P.2d at 1214 (testimony of uncharged acts by three individuals showed a common plan when they testified that as minors and friends of defendant's daughters, Phillips invited them into his garage to view pornographic materials and touched them in inappropriate areas, was relevant to credibility of the victim); *State v. Tolman*, 121 Idaho 899, 905, 828 P.2d 1304, 1310 (1992) (uncharged sexual acts between defendant and each of the three victims involved in the present case were relevant to show a common scheme or plan to target young male victims by winning over their "confidence, trust, and friendship by inveigling them to accompany him on various errands and adventures. . . . then subject[ing] his victims to sexual abuse."); *Longoria*, 133 Idaho at 825, 992 P.2d at 1225 (testimony at sue would have been admissible under I.R.E. 404(b) to show common plan to exploit and sexually abuse an identifiable group of young female victims—girls of similar age, spending the night with the defendant's daughters, whom he abused late at night); *see also State v. Hoots*, 131 Idaho 592, 594, 961 P.2d 1195, 1197 (1998); *State v. Siegel*, 137 Idaho 538, 541, 50 P.3d 1033, 1036 (Ct. App. 2002); *State v. Doe*, 136 Idaho 427, 431, 34 P.3d 1110, 1114 (Ct. App. 2001); *State v. Scovell*, 136 Idaho 587, 590, 38 P.3d 625, 628 (Ct. App. 2001); *State v. McGuire*, 135 Idaho 535, 538-39, 20 P.3d 719, 722-23 (Ct. App. 2001).

In sex crime prosecutions involving minors, the admission of uncharged deviant sexual misconduct has in many cases been "difficult to square . . . with the character evidence prohibition." D. Craig Lewis, *Idaho Trial Handbook*, § 13.9 (1995). The explanation may "be found in the unstated belief that sexual deviancy is a character trait of especially powerful probative value for predicting a defendant's behavior, and that relaxation of the propensity evidence ban is warranted in these cases." *Id.* Nonetheless, there must be limits to the use of bad acts evidence to show a common scheme or plan in sexual abuse cases.

Anderson testified that Field had a history of making "lewd comment[s]" to her. When Anderson was fifteen years old she worked for Field temporarily and she testified Field would make comments to her such as: "If you're going to be my fourth wife, we should get some practice in. Let's go take a tumble in the hay back in the bedroom," and referencing the full

length mirror behind his bed: "We can watch ourselves, see what we look like together. I bet we would look good together." Though these comments made Anderson uncomfortable, she just passed them off thinking, "Oh, that's Bill, you know. He's a pervert."

Anderson also testified that the morning after the alleged incident with T.B., she returned to Field's home after taking T.B. to school and Field was sitting on the couch when she walked in. According to Anderson, their interaction that morning went as follows:

> [S]o I just walked right in and he was sitting on the couch. He just, you know, started talking to me his normal - - he was like, "Oh, there is my next wife." He always called me his next wife. You know, "Come sit by me." "Come sit on the couch and give me some love." So, I sat by him and he gave me a hug and rubbed my leg and things like that. Talked to him for a few minutes - - . . . At first he just - - he was asking me how things were going - - if everything was okay - - did we have enough food to eat - - things like that. Just normal things. And then he asked me if we had slept in the bed and if we liked it. Then he was like, you know, "How about if you and I go take a tumble in it. Let's see if it works for the both of us." I always passed Bill's comments off as bogus. I would say, oh, not this time. Catch you next time, something to that effect.

In this case, Anderson's bad acts testimony is not relevant to a material and disputed issue to the crimes charged to Field and thus is banned by I.R.E. 404. Field's comments to Anderson do not evidence a common scheme or plan. First, the comments are not similar to the offense committed upon H.P. Anderson testified as to specific statements Field made to her from age fifteen on. H.P. was seven years old and did not testify that Field made any comments to her similar to those he made to Anderson.

Second, the similarity to comments he made to T.B. is not strong enough to warrant admission under a common plan or scheme exception. First, since T.B. was seventeen years old at the time of the incident she does not need as much corroboration to establish credibility as do younger children subject to sexual abuse. Second, unlike the many cases that have employed this exception, Anderson's bad acts testimony did not involve any actual incidents of sexual abuse. Furthermore, the type of conduct she testified to was not similar to what T.B. experienced. Though T.B. testified that Field said things to her like "[she] was beautiful," "he liked touching her," and "[her] skin was soft," those comments were made as he was rubbing her back underneath her clothing and right before he started kissing her. The comments to Anderson were of a different type and under different circumstances. Though Field asked Anderson to sit next to him on the couch, and he gave her a hug and rubbed her leg, Anderson did not testify that he asked to rub her back or that he tried to touch her underneath her clothing. The testimony

12

does not show either that Anderson experienced the same type of inappropriate sexual touching that T.B. did, or that T.B. was subjected to the same sort of comments that Anderson was. This proposed evidence shows a disgusting lack of respect for Anderson but is character or propensity evidence only. We hold Anderson's testimony regarding other "bad acts" committed by Field was not relevant to a material issue of the crimes charged and hence, not admissible under I.R.E. 404(b).

## D. Prosecutorial Misconduct

Field contends the district court should have granted his motion for mistrial because the prosecutor improperly questioned Nanci Field. When there is a motion for mistrial based upon prosecutorial error supported by a contemporaneous objection to the underlying procedural or evidentiary error we review the denial of a motion for mistrial for reversible error.

> [T]he question on appeal is not whether the trial judge reasonably exercised his discretion in light of circumstances existing when the mistrial motion was made. Rather, the question must be whether the event which precipitated the motion for mistrial represented reversible error when viewed in the context of the full record. Thus, where a motion for mistrial has been denied in a criminal case, the "abuse of discretion" standard is a misnomer. The standard, more accurately stated, is one of reversible error. Our focus is upon the continuing impact on the trial of the incident that triggered the mistrial motion. The trial judge's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error.

*State v. Sandoval-Tena*, 138 Idaho 908, 912, 71 P.3d 1055, 1059 (2003) (quoting *State v. Shepherd*, 124 Idaho 54, 57, 855 P.2d 891, 894 (Ct. App. 1993) (quoting *State v. Urquhart*, 105 Idaho 92, 95, 665 P.2d 1102, 1105 (Ct. App. 1983))).

When there has been a contemporaneous objection we determine factually if there was prosecutorial misconduct, then we determine whether the error was harmless. *State v. Hodges*, 105 Idaho 588, 590-592, 671 P.2d 1051, 1053-1055 (1983) (alleged misconduct was objected to and so the Court did not apply a fundamental error analysis). When there is no contemporaneous objection a conviction will be reversed for prosecutorial misconduct only if the conduct is sufficiently egregious so as to result in fundamental error. *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003); *State v. Raudebaugh*, 124 Idaho 758, 769, 864 P.2d 596, 607 (1993); *State v. Smith*, 117 Idaho 891, 898, 792 P.2d 916, 923 (1990); *State v. LaMere*, 103 Idaho 839, 844, 655 P.2d 46, 51 (1982); *State v. Garcia*, 100 Idaho 108, 110, 594 P.2d 146, 148 (1979). However, even when prosecutorial misconduct has resulted in fundamental error, the conviction

will not be reversed when that error is harmless. *State v. Christiansen*, 2007 WL 1264014, *9; *State v. LaMere*, 103 Idaho at 843-44, 655 P.2d at 50-51.

In this case, the alleged prosecutorial misconduct was objected to by Field's attorney and a motion for mistrial was entered by appellant based upon that objection. Therefore, we will determine whether there was any prosecutorial misconduct, and if so, whether the error was harmless. We recognize that we must keep in mind the realities of trial when determining whether prosecutorial misconduct has occurred:

> While our system of criminal justice is adversarial in nature, and the prosecutor is expected to be diligent and leave no stone unturned, he is nevertheless expected and required to be fair. However, in reviewing allegations of prosecutorial misconduct we must keep in mind the realities of trial. A fair trial is not necessarily a perfect trial.

*State v. Estes*, 111 Idaho 423, 427-28, 725 P.2d 128, 132-33 (1986) (citations omitted).

During the cross examination of Nanci Field, the State began to ask whether Field was investigated for an incident involving his stepdaughter, A.C. Before the State could finish asking its question, Field objected.[6] The referenced investigation involved an allegation that one day before Field and Nanci were married, in Nanci's presence, Field accidentally touched A.C.'s breast while rubbing lotion on her. The court ruled that since the investigation may have been initiated by A.C.'s father, whom Nanci was then in the process of divorcing, and that since the investigation was dropped and not pursued, the questioning of Nanci regarding the investigation would be prohibited. Field then moved for a mistrial which was denied and the jury then returned to the courtroom and cross examination resumed.

---

[6] That portion of the cross went as follows:

Q. How did Bill and A.C. interact?

A. How did they talk or - -

Q. How did they act around each other?

A. Just like a father and daughter would act.

Q. Do you have any concerns about that?

A. I don't.

Q. Seemed appropriate?

A. Yes.

Q. In fact, Bill was investigated concerning his relationship - -

Mr. Kumm: Objection, Your Honor.

14

Before trial, Field made a motion in limine requesting that the court prevent the admission of any testimony regarding allegations that defendant has previously engaged in any illicit sexual activity with a minor, including the fact that Field was investigated for the incident involving A.C. In a pretrial hearing, the court declined to prohibit all such testimony, stating it would depend on what the defendant asked his witnesses during trial. Nonetheless, during the pretrial hearing, the State told the court that if it intended on asking Field, A.C. or Nanci Field about the investigation it would go to the court beforehand so the court could make a ruling on whether it would be proper in cross examination. Yet, the State failed to do so before questioning Nanci about the investigation. Clearly the testimony the State was attempting to elicit from Nanci was highly prejudicial and irrelevant in this case. *See Sheperd*, 124 Idaho 54, 57-58, 855 P.2d 891, 894-95 (Ct. App. 1993). The judge had previously expressed that any testimony regarding the investigation might be excluded and hence, the State had promised it would speak with the judge outside the presence of the jury before referring to the investigation. Thus, in this case the questioning of Nanci about the investigation before discussing it with the judge outside the presence of the jury was prosecutorial misconduct.

Nonetheless, as with the other trial errors, Field must show the prosecutorial misconduct was not harmless error. We hold the error was harmless, *see infra* Part III.E.; hence, the judge did not err in denying Field's motion for mistrial.

**E. Harmless and Cumulative Error**

Since we hold that the joinder of the offenses, the admission of H.P.'s out of court statements, and the introduction of Anderson's "bad acts" testimony were improper, and that there was prosecutorial misconduct it is now necessary to determine pursuant to I.C.R. 52 whether these errors were harmless.[7] *Anderson*, 138 Idaho at 362, 63 P.3d at 488 (holding the court must determine whether misjoinder was harmless); *Lane*, 474 U.S. at 449 (holding that in order to harmonize Fed. R. Crim. Pro. 8 and Fed. R. Crim. Pro. 52(a) an error involving misjoinder "requires reversal only if the misjoinder results in actual prejudice."); *Zimmerman*, 121 Idaho at 977, 829 P.2d at 867 (conviction reversed when Court could not say that beyond a reasonable doubt there was no reasonable possibility that improperly admitted hearsay statements contributed to the conviction); *State v. Jones*, 125 Idaho 477, 488, 873 P.2d 122, 133

---

[7] "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." I.C.R. 52.

(1994) (though it was err to admit evidence of prior crime, no reversal when error was harmless); *Hodges*, 105 Idaho at 592, 671 P.2d at 1055 (prosecutorial misconduct reviewed for harmless error).

To hold the errors are harmless, the Court "must find beyond a reasonable doubt that the jury would have reached the same result without the admission of the challenged evidence." *Robinett*, 141 Idaho at 113, 106 P.3d at 439. The Court then must determine beyond a reasonable doubt whether if the trials were held separately, if the hearsay and Anderson's "bad acts" testimony were excluded, and if there was no prosecutorial misconduct the jury would have reached the same result.

After reviewing the record, especially in light of the recorded telephone conversations in which T.B. and Field discuss the incident involving T.B., we are still convinced beyond a reasonable doubt that even absent the errors the jury would have reached the same result.

Nonetheless, the cumulative error doctrine requires reversal of a conviction when there is "an accumulation of irregularities, each of which by itself might be harmless, but when aggregated, the errors show the absence of a fair trial, in contravention of the defendant's constitutional right to due process." *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998) (internal quotations and citation omitted)). Though the errors may be harmless standing by themselves, the aggregation of these errors, particularly considering the undoubtedly prejudicial effect of the improper joinder, show that Field was denied a fair trial. We hold that there is reversible cumulative error in this case, reverse the convictions, and remand to the trial court for new and separate trials.

**F. Jury Instruction**

In order to give guidance to the trial court on remand in these cases, we will address Field's jury instruction arguments. Field argues that the jury instruction defining reasonable doubt violated his right to a unanimous verdict. The Court exercises free review over the propriety of jury instructions. *State v. Sheahan*, 139 Idaho 267, 281, 77 P.3d 956, 970 (2003). "When reviewing jury instructions, this Court must determine whether 'the instructions, as a whole, fairly and adequately present the issues and state the law.'" *Id*. (quoting *Silver Creek Computers, Inc. v. Petra, Inc.*, 136 Idaho 879, 882, 42 P.3d 672, 675 (2002). An erroneous instruction is reversible error only when "the instructions, . . . taken as a whole, misled the jury or prejudiced a party." *Id*. (citations omitted.

16

Jury Instruction No. 22 stated:

> YOU ARE INSTRUCTED, that a defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether the defendant's guilt is satisfactorily shown, the defendant is entitled to a verdict of not guilty. This presumption places upon the state the burden of proving the defendant guilty beyond a reasonable doubt.
>
> Reasonable doubt is defined as follows: It is not mere possible doubt, because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is the state of the case which after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that *they* cannot say *they* feel an abiding conviction, to a moral certainty, of the truth of the charge.

(Emphasis added). We note that the second paragraph of this instruction is identical to ICJI 103.

Field argues that the use of the word "they" instructs individual jurors to conclude that any doubts he or she had about guilt are not reasonable if the other jurors do not hold the same doubts. The Idaho Court of Appeals recently upheld the use of a similar jury instruction when faced with the same argument. *State v. Sanchez*, 142 Idaho 309, 127 P.3d 212 (Ct. App. 2005); *State v. Williams*, 141 Idaho 826, 118 P.3d 158 (Ct. App. 2005).[8] However, the court did not interpret the jury instruction to convey to the jurors that they should subordinate their own views to those of other jurors. *Williams,* 141 Idaho at 828, 118 P.3d at 160. Furthermore, the court held any misperception would have been corrected by subsequent instructions. *Id*.

The definition in question does not instruct individual jurors to subordinate their view to the view of the other jurors. Furthermore, though Field argues to the contrary, any confusion possibly created by Jury Instruction No. 22 was cured by the subsequent instructions. Other jury instructions make it clear that each individual juror must come to his or her own opinion and act on that opinion. Jury Instruction No. 25 states in part:

> As jurors you have a duty to consult with one another and to deliberate before making your individual decisions. You may fully and fairly discuss among yourselves all of the evidence you have seen and heard in this courtroom about this case, together with the law that relates to this case as contained in these instructions.
>
> During your deliberations, you each have a right to re-examine your own views and change your opinion. You should only do so if you are convinced by fair and honest discussion that your original opinion was incorrect based upon the

---

[8] In those cases, the jury instruction was nearly identical to the second paragraph of Field's Jury Instruction No. 22, except that it omitted the references to "moral evidence" and "moral certainty." *Sanchez*, 142 Idaho at 320, 127 P.3d at 223; *Williams*, 141 Idaho at 827, 118 P.3d at 159.

evidence the jury saw and heard during the trial and the law as given you in these instructions.

Consult with one another. Consider each other's views, and deliberated [sic] with the objective of reaching an agreement, if you can do so without disturbing your individual judgment. Each of you must decide this case for yourself; but you should do so only after a discussion and consideration of the case with your fellow jurors.

However, none of you should surrender your honest opinion as to the weight or effect of the evidence or as to the innocence or guilt of the defendant because the majority of the jury feels otherwise or for the purpose of returning a unanimous verdict.

Jury Instruction No. 26 states in part:

In this case, your verdict must be unanimous. When you all arrive at a verdict, the presiding juror will sign it and you will return it into open court.

Your verdict in this case cannot be arrived at by chance, by lot, or by compromise.

The instructions as a whole fairly and adequately state the law. Hence, we hold that the language Field complains of does not instruct the jurors that they must each individually cast aside their own doubts if the other jurors do not also have doubts. Furthermore, we hold any confusion was cured by the use of Jury Instructions No. 25-26.

**G. Sentence Review**

Field argues the sentences imposed upon him are unreasonable. However, since we hold the convictions must be reversed and that Field is entitled to new and separate trials, it is not necessary to address this issue.

## IV. CONCLUSION

We hold that the joinder of the offenses was improper. We also hold that the admission of certain testimony (Anderson's "bad acts" testimony and testimony regarding H.P.'s out of court statements) was improper. Additionally, we hold that there was prosecutorial misconduct. We also hold that the aggregation of these errors is cumulative error and mandates a reversal. We remand for new, separate trials on the lewd conduct charge and the sexual battery charge. Finally, we hold that the reasonable doubt jury instruction was proper.

Chief Justice SCHROEDER and Justices TROUT, EISMANN and JONES, **CONCUR.**

18