**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 42217**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **2016 Unpublished Opinion No. 402** |
| | ) | |
| Plaintiff-Respondent, | ) | **Filed: February 24, 2016** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **ALFONSO VILLANUEVA, JR.,** | ) | **THIS IS AN UNPUBLISHED** |
| | ) | **OPINION AND SHALL NOT** |
| Defendant-Appellant. | ) | **BE CITED AS AUTHORITY** |
| | ) | |

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. Christopher S. Nye, District Judge.

Judgment of conviction for felony domestic battery, <u>vacated</u> and case <u>remanded</u>.

Sara B. Thomas, State Appellate Public Defender; Jason C. Pintler, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Lori A. Fleming, Deputy Attorney General, Boise, for respondent.

_____

GRATTON, Judge

Alfonso Villanueva, Jr. appeals from his judgment of conviction for felony domestic battery pursuant to Idaho Code § 18-918. Villanueva asserts that the prosecuting attorney deprived him of his right to due process of law through misstatements made in closing arguments. For the reason set forth below, we vacate Villanueva's judgment and remand to the district court.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

Early in the morning of June 25, 2013, Amanda called 911 and reported that her father, Villanueva, had hit her mother, Maria, in the head with a beer bottle. She reported her mother was bleeding and that they were enroute to the hospital. Amanda asked that police be sent to Villanueva's residence because he was "crazy" and "said he might kill himself."

1

An officer took statements from Maria and Amanda at the hospital. Amanda told the officer that she and Maria were together in a car discussing how poorly Villanueva treated them, and during the conversation she realized that her cell phone was connected to the home phone and Villanueva was listening to their conversation. Amanda and Maria both returned home to talk with Villanueva. Upon arrival, Maria was met at the front door by Villanueva who called her names and then threw what Amanda believed to be a beer bottle at Maria. Villanueva then pushed Maria, causing her to fall backwards. Maria relayed a similar story, but instead of specifying that a beer bottle hit her in the head, she said that Villanueva threw "something heavy" at her. Maria also relayed the same events to a detective who interviewed her at the Nampa Family Justice Center less than forty-eight hours after the incident.

Meanwhile, another officer responded to Villanueva's residence to take his statement. While Villanueva was being interviewed, additional officers searched the front yard and found droplets of blood throughout the grass and along the sidewalk, driveway area around the house, and pieces of a telephone--a cordless handset that were out in the yard. The battery and the back of the phone had separated from the phone itself and were scattered around the yard. While being interviewed, Villanueva appeared to be intoxicated and admitted that he had been drinking. He denied that the argument with Maria was physical and said the blood in his front yard could have come from a dog. He denied hitting Maria with the phone, but stated that he threw the phone "up in the air" because he overheard Maria and Amanda's conversation and was "hurt" by it. At the end of the interview, Villanueva was arrested and charged with felony domestic battery.

At Villanueva's preliminary hearing, Maria's testimony was similar, but when called as a witness by the defense, she testified that she believed Villanueva accidentally hit her in the head with the phone. Amanda also testified that Villanueva had thrown the phone towards her after she had asked to use it. The magistrate found probable cause and bound the case over to district court for trial. At trial, Amanda and Maria testified for the defense. Amanda testified that her father accidentally hit her mother in the head with the telephone. She explained that her parents were arguing because she was using drugs and not following the household rules, and her father had ordered her to move out. Her mother then drove Amanda to a friend's house, but the friend was not home. When they returned home, she asked her father if she could use the telephone. Amanda then testified that her father "tossed" the phone to her in an "underhand motion," but

2

that her mother "got in the way" and was struck by the phone. Amanda acknowledged her prior inconsistent statements and testified that she lied because she was angry with her father for demanding that she move out. She further testified that she told the prosecutor on more than one occasion that she had lied, but the prosecutor consistently disregarded her statements.

Maria's testimony mirrored Amanda's, and she similarly expressed dissatisfaction with the prosecutor's office. After eight hours of deliberations, the jury was unable to reach a unanimous verdict being split six to six. The district court declared a mistrial because the jurors could not agree. The State retried Villanueva, and as in the first trial, presented the testimony of the 911 dispatcher, both investigating officers, and Dr. Bostaph--an expert who testified that victims sometimes recant, and so victimless prosecution is the best practice for prosecuting domestic violence cases. The State did not call Amanda or Maria to testify, and successfully moved to exclude any testimony by them about their dissatisfaction with the prosecutor's office and their statements to the prosecutor that the incident was an accident. The defense called Amanda and Maria and both testified to the version of events they gave at Villanueva's first trial, aside from the excluded testimony.

In the prosecutor's closing argument, she made multiple statements, explicitly and impliedly, that Amanda and Maria had never previously shared the version of events contained in their testimony. During closing arguments, the prosecutor argued, "[w]hat else isn't corroborated? Besides the testimony of Maria and Amanda now that they've had eight months to think about what they're going to say at trial, now that they're likely living together . . . ." The prosecutor continued, "[t]he statements that Amanda and Maria went back to the house because the friend wasn't there. No mention of that to Officer Harward. No mention of that to Detective Seibel. Only eight months later at trial are you hearing about it for the first time."

The prosecutor started her rebuttal argument as follows:

> Defense counsel's right. This is a tragedy. It's a tragedy that Maria had a phone thrown at her head, had to get five stitches. Eight months later, still has a scar and she and her daughter were willing to come in and lie to get the defendant out of the trouble he's presently facing. That is a tragedy.
> Now, for you to accept the defense theory of the case, then you have to accept the word of two people who got on the stand and told you they lied to everyone else involved. They lied to the ER doctor. They lied to the 911 dispatcher. They lied to a detective. But they have to be telling the truth today at the trial. They lied about everything else but they're lying--they're not lying

3

when they're on the stand. Everything they've said on the stand is true. Everything else they've said is a lie.

So how are you supposed to accept that they're telling the truth now but they lied every other occasion?

The prosecutor continued, "Defendant doesn't say anything about kicking his daughter out. Defendant doesn't say anything about her using drugs. The first mention of this is at trial. Pretty convenient." Finally, when arguing that Maria was a recanting victim, the prosecutor argued, "Maria got up on the stand, said that she lied, said that she didn't remember, said everything that happened was an accident. That now she was suddenly telling the truth and the defendant passed the phone to her."

The jury found Villanueva guilty of felony domestic battery and the district court sentenced him to a unified term of six years with two and one-half years determinate. Villanueva timely appeals.

## II.

## ANALYSIS

Villanueva argues that his conviction should be overturned because the prosecutor committed fundamental error by telling the jury in closing argument that Amanda and Maria had never previously shared the version of events they testified to at Villanueva's second trial.

Villanueva made no contemporaneous objection to the prosecutor's closing at trial. In *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010), the Idaho Supreme Court clarified the fundamental error doctrine as it applies to allegations of prosecutorial misconduct. If the alleged misconduct was not followed by a contemporaneous objection, an appellate court should reverse when a defendant persuades the court that the alleged error: (1) violates one or more of the defendant's unwaived constitutional rights; (2) is clear or obvious without the need for reference to any additional information not contained in the appellate record; and (3) affected the outcome of the trial proceedings. *Id*. at 226, 245 P.3d at 978. The State has conceded the first two prongs of the *Perry* test, acknowledging that the prosecutor's closing statements that Amanda and Maria had never previously shared the version of events they testified to at Villanueva's second trial "were plainly improper." Accordingly, the only remaining issue is whether those closing statements impacted Villanueva's substantial rights by affecting the outcome of the trial.

While our system of criminal justice is adversarial in nature, and the prosecutor is expected to be diligent and leave no stone unturned, he or she is nevertheless expected and

4

required to be fair. *State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007). However, in reviewing allegations of prosecutorial misconduct we must keep in mind the realities of trial. *Id.* A fair trial is not necessarily a perfect trial. *Id.*

Closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007). Its purpose is to enlighten the jury and to help the jurors remember and interpret the evidence. *Id.*; *State v. Reynolds*, 120 Idaho 445, 450, 816 P.2d 1002, 1007 (Ct. App. 1991). Both sides have traditionally been afforded considerable latitude in closing argument to the jury and are entitled to discuss fully, from their respective standpoints, the evidence and the inferences to be drawn therefrom. *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003); *Phillips*, 144 Idaho at 86, 156 P.3d at 587.

The State avers that the outcome of the trial was not affected by the prosecutor's closing statements because the timing of Maria's and Amanda's retraction of their initial statements was not dispositive to the jury's determination because there was additional evidence that undermined Maria's and Amanda's testimony. While the State presented testimony that conflicted with Maria's and Amanda's testimony, the jury's decision largely relied upon making a credibility determination of Maria's and Amanda's testimony. The evidence put on by the State was largely impeachment evidence of Amanda's and Maria's testimony, and the State's only substantive evidence was Amanda's 911 phone call. Thus, the jury's determination was mostly based upon whether or not they believed Maria's and Amanda's testimony. That testimony was severely damaged when the prosecutor made statements in her closing that both Maria and Amanda had never previously shared the version of events contained in their testimony.[1] To the contrary, Amanda and Maria had recanted the initial version of events months earlier and had relayed that information to the prosecutor. Furthermore, Amanda and Maria were then consistent with that version of events--including throughout Villanueva's first and second trials. The prosecutor's representation to the jury that this was the first time Amanda and Maria were changing their story was severely damaging to the credibility of both witnesses. It was severely damaging because it conveyed to the jury that the two were colluding for months to produce a new story for trial. As a result, the erroneous statements made by the prosecutor in

---

[1] In addition, the State had called an expert to challenge their trial testimony by explaining that victims sometimes recant.

her closing had a reasonable possibility of affecting the outcome of the trial proceedings, and the claim satisfies the *Perry* fundamental error test.

## III.
## CONCLUSION

Villanueva demonstrated fundamental error based upon the prosecutor's closing statements. Accordingly, we vacate Villanueva's judgment of conviction for felony domestic battery and remand to the district court.

Chief Judge MELANSON and Judge GUTIERREZ **CONCUR**.