**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 35209**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2011 Opinion No. 11 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: March 11, 2011 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| ARISTEO GOMEZ, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Cassia County. Hon. Michael R. Crabtree, District Judge.

Judgment of conviction for lewd conduct with a minor under the age of sixteen, affirmed.

Molly J. Huskey, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant. Jordan E. Taylor argued.

Hon. Lawrence G. Wasden, Attorney General; Rebekah A. Cudé, Deputy Attorney General, Boise, for respondent. Rebekah A. Cudé argued.

---

PERRY, Judge Pro Tem

Aristeo Gomez appeals from the judgment of conviction entered upon a jury verdict finding him guilty of lewd conduct with a minor under the age of sixteen, Idaho Code § 18-1508. He contends that the district court improperly admitted evidence relating to uncharged sexual misconduct. We affirm.

**I.**

**FACTS AND PROCEDURAL BACKGROUND**

In 2004, then fifteen-year-old V.B. was living with her mother, F.B., and her mother's boyfriend,[1] Gomez, in Gomez's house in Burley. While V.B.'s mother was gone on vacation, V.B. awoke early one morning to Gomez touching her, over her clothes, on her breasts, buttocks,

---

[1] V.B.'s mother, F.B., testified that she and Gomez are married "[b]y the church," but not by "the civil authorities." V.B. and her sisters testified variously that Gomez is their stepfather and/or their mother's boyfriend.

and vagina. V.B. told him to stop, and Gomez offered her one hundred dollars, as well as some clothes, to sleep with him. V.B. told Gomez to get out of her bedroom, and Gomez gave her twenty dollars, which V.B.'s mother had told him to give her, for both her and her brother, and then left the room. V.B. locked her door and went back to sleep. V.B.'s sixteen-year-old brother was sleeping in the same bed with her, but he did not wake up. V.B. did not wake her brother to tell him what had happened, nor did she tell anyone else about the incident because it was "embarrassing." V.B. also stated that she did not tell her mother because Gomez had previously told V.B. that her mother would not believe her, that "no one would believe [her]."

Sometime after this incident, while V.B. was alone in her bedroom talking on the phone with her boyfriend, Gomez tried to get into her bedroom. V.B. told her boyfriend not to hang up on her. When her boyfriend inquired as to why he should not hang up, she related some concerns about Gomez and told him that Gomez was trying to get into her room. V.B.'s boyfriend told her brother about the incident, and her oldest sister, E.B., also learned what had happened. In January 2006, V.B. and her sisters met together and discovered that Gomez had sexually abused each of them. They approached their mother, F.B., with the allegations, and she told them they would talk about it later. F.B. testified at trial that she did not believe them. However, V.B. and her sisters went to E.B.'s residence where they called the police and submitted written statements regarding the abuse. Gomez was arrested and subsequently charged with lewd conduct with a minor under the age of sixteen.

Prior to trial, the State filed a notice of its intent to introduce evidence of other crimes, wrongs, or acts as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident pursuant to Idaho Rule of Evidence 404(b), attaching the written statements of V.B., as well as her sisters, E.B., M.A.R.B., S.B., and M.L.B. The statements indicated that Gomez had sexually abused V.B. and her sisters. The State filed a second notice of its intent to introduce Rule 404(b) evidence, attaching the written statement of C.G., a friend of V.B., as well as related police reports. Gomez filed an objection to the State's intent to use Rule 404(b) evidence, as well as a motion in limine to exclude such evidence from trial.

At a hearing held on Gomez's motion, he argued that the evidence was not relevant to any issue other than character or propensity and that its prejudice outweighed its probative value. The district court denied the motion, relying upon *State v. Phillips*, 123 Idaho 178, 845 P.2d 1211 (1993), but admonished the State that it would not be allowed to mention any uncharged

sexual misconduct unless an offer of proof was made to the court as was required in the *Phillips* case. While the parties and the court indicated that a hearing would be held to entertain the State's offer of proof, the record is unclear as to whether this occurred. Each of the State's proposed witnesses included in the notices did, however, testify at trial regarding uncharged sexual misconduct.

In addition to testifying regarding the charged conduct, V.B. also testified that Gomez had touched her on her breasts, buttocks, and vagina on previous occasions. She stated that the touching began when she was about twelve or thirteen when Gomez and her mother were living in "Paul Housing." She testified that she would spend the night there on weekends and during the summer. V.B. stated that, on one occasion, she was taking a shower and Gomez unscrewed the doorknob and tried to get into the bathroom. She also testified that Gomez would make inappropriate comments about her vaginal area, saying it was hairy; that he would walk around in a towel or his underwear; and that he would expose himself to her when he would get out of the shower.

Each of V.B.'s full sisters also testified regarding similar incidents occurring with Gomez. V.B.'s oldest sister, E.B., testified that Gomez abused her from the time she was twelve until she moved out of the house when she was approximately eighteen years old. She testified that the first incident occurred when her mother and Gomez were living in a house in Rupert. She stated, "[Gomez] grabbed me and hugged me really tight, and he told me that he wanted to be with me." She testified that she understood that to mean Gomez wanted to sleep with her. She also testified that she thought Gomez offered her money, but that she did not remember how much. She stated no one saw the incident because they were upstairs, and she did not tell anyone because she was embarrassed.

E.B. testified that while staying at the house in Rupert, Gomez would touch her in the middle of the night. She stated that, on one occasion, she woke up to him next to her in bed touching her breasts. She testified that she told Gomez to get out of her bed, and he "grabbed his private part . . . and kind of showed it off and walked away." She testified that her mother was sleeping in the bed next to her and her brothers and sisters were sleeping in the bed with her, but she was sleeping on the edge. She stated that she would sleep in between her siblings so that Gomez could not get to her, but that sometimes she would still sleep on the edge. She testified that the touching continued while in Rupert and then when her mother and Gomez moved to Paul

3

Housing. E.B. stated that while in Paul Housing, she would often wake up to Gomez touching her, both over and under her clothing, on her breasts and between her legs. E.B. also testified that Gomez walked in on her while she was taking a shower and opened the curtain. Whenever E.B. threatened to tell her mother about Gomez's actions, he would respond, "No, you're not going to tell her."

Another sister, M.A.R.B., who is approximately two years younger than E.B. and approximately two and one-half years older than V.B., also testified that Gomez abused her until she moved out of the house at the age of sixteen. She testified that Gomez "always tried to touch me" and related one incident where Gomez grabbed her breasts after her mother had left the house to sell tamales. She stated that on another occasion, she was sleeping on the side of the bed next to one of her siblings and awoke to find her pants and underwear pulled down from the front, and Gomez touching her. M.A.R.B. testified that when she told Gomez not to touch her, he asked where E.B. had gone. She told him to leave her alone, and he ultimately left. She testified that on another night, she and E.B. were asleep and she woke up to Gomez touching E.B.'s breast. M.A.R.B. also testified that Gomez watched her taking a bath through a hole in the door because the doorknob was missing. She stated that she never told anyone because it was embarrassing. M.A.R.B. also testified that she did not tell her mother about any of the incidents because Gomez told her he would say it was her fault and that she was lying.

S.B., V.B.'s younger sister, also testified that Gomez began abusing her when she was eleven or twelve, and that the first incident occurred when she was passing Gomez in the kitchen. S.B. stated that Gomez grabbed her and touched her, over the clothes, on her vagina when she walked by him. She testified that no one saw the touching and she did not tell anyone because she was embarrassed. S.B. also stated that she woke up early one morning to Gomez touching her. She testified that Gomez had pulled his pants down, as well as hers, and that he touched his penis against her vagina. She stated that she started to cry and he said, "Come on. I'll give you $2." She continued to cry, so Gomez got up, and she put her pants on and ran out. S.B. testified that Gomez had also touched her on other occasions and tried to get into the bathroom and grab her when she sent her sister to get a towel for her. S.B. testified that she told Gomez she was going to tell her mother, to which he responded, "Go ahead and tell her. She won't ever believe you."

4

M.L.B., V.B.'s youngest full sister, testified that Gomez abused her for the first time while she was watching television in the living room at the age of eleven. M.L.B. stated that Gomez came up to her while she was sitting on the couch and started grabbing her breasts and tried to touch her in between her legs. She stated that she told him to stop and then left to join her half-siblings outside. She testified that another incident occurred while she was sleeping in her mother's room. She stated that she woke up to Gomez touching her, and she thought he had been touching her breasts and in between her legs because her bra and her pants were undone. She testified that her half-siblings were sleeping in the same bed, but they did not wake up. M.L.B. also testified that Gomez came into the bathroom while she was taking a shower. M.L.B. also stated when she told Gomez that she was going to tell her mother, he told her that her mother would not believe her.

C.G., a friend of V.B.'s, also testified at trial. She testified that when she was thirteen or fourteen, she spent the night with V.B. at Gomez's house in Burley. She stated that she was sleeping on a mattress with V.B. and woke up to Gomez touching her vagina over her clothing.

In addition to Gomez's motion in limine to exclude Rule 404(b) evidence, he also requested a continuing objection prior to E.B.'s testimony. The court acknowledged the objection and stated that it would continue to overrule it based upon the *Phillips* opinion. However, the court did give a limiting instruction stating that the jury was not to infer a "pattern of behavior" from E.B.'s testimony, but that it went to V.B.'s credibility. Gomez again renewed his objection prior to the jury hearing testimony from M.A.R.B., S.B., and C.G, and prior to his cross-examination of M.L.B. The court gave a limiting instruction following each objection, generally instructing the jury that any other wrongs or acts, if believed, were not to be considered as evidence of Gomez's character or any propensity to commit such acts and could only be used for the limited purposes of proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The jury was similarly instructed in the final jury instructions.

The jury found Gomez guilty of lewd conduct with a child under the age of sixteen. The district court entered a judgment of conviction and imposed a unified sentence of twenty years, with ten years determinate. Gomez appeals.

## ANALYSIS

Gomez contends that the district court erred by improperly admitting evidence of uncharged sexual misconduct in the form of testimony from E.B., M.A.R.B., S.B., M.L.B., and C.G.[2] He argues that the evidence was not relevant to a material and disputed issue other than propensity. Evidence of other crimes, wrongs, or acts is not admissible to prove a defendant's criminal propensity. I.R.E. 404(b); *State v. Johnson*, 148 Idaho 664, 667, 227 P.3d 918, 921 (2010); *State v. Winkler*, 112 Idaho 917, 919, 736 P.2d 1371, 1373 (Ct. App. 1987). However, such evidence may be admissible for a purpose other than that prohibited by I.R.E. 404(b). *State v. Avila*, 137 Idaho 410, 412, 49 P.3d 1260, 1262 (Ct. App. 2002). In determining the admissibility of evidence of prior bad acts, the Supreme Court has utilized a two-tiered analysis. The first tier involves a two-part inquiry: (1) whether there is sufficient evidence to establish the prior bad acts as fact; and (2) whether the prior bad acts are relevant to a material disputed issue concerning the crime charged, other than propensity. *State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009). Such evidence is relevant only if the jury can reasonably conclude the act occurred and the defendant was the actor. *Id.* We will treat the trial court's factual determination that a prior bad act has been established by sufficient evidence as we do all factual findings by a trial court. *State v. Parmer*, 147 Idaho 210, 214, 207 P.3d 186, 190 (Ct. App. 2009). We defer to a trial court's factual findings if supported by substantial and competent evidence in the record. *State v. Porter*, 130 Idaho 772, 789, 948 P.2d 127, 144 (1997); *Parmer*, 147 Idaho at 214, 207 P.3d at 190. Whether evidence is relevant is an issue of law. *State v. Atkinson*, 124 Idaho 816, 819, 864 P.2d 654, 657 (Ct. App. 1993). Therefore, when considering admission of evidence of prior bad acts, we exercise free review of the trial court's relevancy determination. *Id.*

The second tier in the analysis is the determination of whether the probative value of the evidence is substantially outweighed by unfair prejudice. *Grist*, 147 Idaho at 52, 205 P.3d at 1188. When reviewing this tier we use an abuse of discretion standard. *Id.* When a trial court's

---

[2] As part of his motion in limine, Gomez objected to the State's intent to use Rule 404(b) evidence, including evidence of prior sexual misconduct with the victim, V.B. On appeal, however, Gomez only asserts that the district court erred by admitting the testimony of V.B.'s sisters and friend. As such, we need not address the admissibility of V.B.'s testimony regarding prior bad acts of Gomez.

discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

## A. Specific Articulation

Gomez contends that the district court did not make the required determination, as set forth in *Grist*, that there was sufficient evidence to establish the prior bad acts as fact. He argues that while a hearing was scheduled for the State to make its offer of proof, there is no record that such a hearing occurred and, as such, this Court cannot review whether the district court made the requisite finding. He asserts that the court erred because it failed to make the requisite finding on the record.

While Gomez argues that the court was required to make a specific finding, on the record, as to whether a jury could reasonably conclude that the prior acts occurred and that the defendant was the actor, such a procedure is not always required. This Court recently addressed a similar argument in *Cooke v. State*, 149 Idaho 233, 233 P.3d 164 (Ct. App. 2010). In that case, this Court clarified that the district court is only required to make a specific articulation as to whether the prior conduct occurred if that question is squarely at issue. *Cooke*, 149 Idaho at 240, 233 P.3d at 171. If the question is at issue, a specific articulation is necessary for the determination of relevance. *Id.* Gomez did not argue below that the other crimes, wrongs, or acts did not occur; rather, he argued that they were not relevant to any issue other than propensity and that the prejudice of that evidence outweighed its probative value. As such, the court was never called upon to make a determination on the record as to whether the uncharged acts occurred. Therefore, the issue of whether the uncharged misconduct occurred was not before the district court, and no specific articulation was required.

## B. Relevance

Gomez argues that because the district court did not have the benefit of *Grist* and *Johnson*, it erred by applying the wrong standard as set forth in *State v. Phillips*, 123 Idaho 178, 845 P.2d 1211 (1993). Gomez asserts that *Phillips* has been implicitly overruled because it relied exclusively upon *State v. Moore*, 120 Idaho 743, 819 P.2d 1143 (1991), and *State v.*

7

*Tolman*, 121 Idaho 899, 828 P.2d 1304 (1992), which have been partially overruled by *Grist* and *Johnson*. The State contends that *Grist* and *Johnson* do not preclude admission of the testimony of Gomez's other victims.

In *Grist*, the Idaho Supreme Court acknowledged that *Moore* and *Tolman* had sometimes been "interpreted as creating an exception in child sex cases to the prohibition of character evidence." *Grist*, 147 Idaho at 51, 205 P.3d at 1187; *see also Johnson*, 148 Idaho at 668, 227 P.3d at 922. The Court held, however, that "admission of I.R.E. 404(b) evidence in a child sex case is subject to the same analysis as the admission of such evidence in any other case." *Grist*, 147 Idaho at 51, 205 P.3d at 1187. The Court further determined that "[e]vidence of uncharged misconduct may not be admitted pursuant to I.R.E. 404(b) when its probative value is entirely dependent upon its tendency to demonstrate the defendant's propensity to engage in such behavior." *Id.* at 54, 205 P.3d at 1190.

*Grist* criticized the rationale set forth in *Moore*, stating that the Court's explanation in that case could have just as easily been stated as follows: "If the defendant has committed another sex offense, it is more probable that he committed the offense for which he is charged, thus reducing the probability that the prosecuting witness is lying, while at the same time increasing the probability that the defendant committed the crime." *Id.* at 54, 205 P.3d at 1190. The unstated premise in *Moore* was that "[i]f he did it before, he probably did it this time as well." *Id. Grist* held that "[t]his complete reliance upon propensity is not a permissible basis for the admission of evidence of uncharged misconduct." *Id.* Nevertheless, *Grist* declined to overrule *Moore* in its entirety, acknowledging that *Moore* correctly states: "Where relevant to the credibility of the parties, evidence of a common criminal design is admissible." *Grist*, 147 Idaho at 54, 205 P.3d at 1190 (quoting *Moore*, 120 Idaho at 746, 819 P.2d at 1146).

While we recognize that *Grist* denotes a shift from *Moore* and its progeny, we do not read that case as prohibiting admissibility of prior bad act evidence entirely. Rather, the admissibility of evidence of prior bad acts hinges on the question of whether "its probative value is *entirely dependent* upon its tendency to demonstrate the defendant's propensity to engage in such behavior." *Grist*, 147 Idaho at 54, 205 P.3d at 1190 (emphasis added). If it is, the evidence is inadmissible as "*complete reliance* upon propensity evidence is not a permissible basis for the admission of evidence of uncharged conduct." *Id.* (emphasis added). In other words, the fact that evidence of prior bad acts tends to demonstrate the defendant's propensity to engage in such

behavior does not necessarily preclude its admissibility. Although evidence of prior bad acts may tend to show a defendant's propensity to commit a crime, such evidence may still be admissible under I.R.E. 404(b) if it is relevant for another purpose. *See State v. Walker*, 109 Idaho 356, 359, 707 P.2d 467, 470 (Ct. App. 1985).

Evidence of an uncharged sex offense is relevant, and may be admissible, where it proves motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* I.R.E. 404(b). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401. *Grist*'s disapproving evaluation of *Moore* as stating that "[i]f the defendant has committed another sex offense, it is more probable that he committed the offense for which he is charged," should not be read to eviscerate I.R.E. 401. As noted above, *Grist* does not impose a blanket prohibition on all evidence of uncharged sex offenses. Rather, the import of *Grist* is that the "Idaho Rules of Evidence require that trial courts treat the admission of evidence of uncharged misconduct in child sex crime cases no differently than the admission of such evidence in other cases." *Grist*, 147 Idaho at 55, 205 P.3d at 1191.

Gomez contends that *Phillips* relied upon the "unstated premise" of *Moore* and, as such, the district court's reliance on *Phillips* was in error. We need not address the continued validity of *Phillips* because we review questions of relevance de novo. *See State v. Raudebaugh*, 124 Idaho 758, 764, 864 P.2d 596, 602 (1993). Having reviewed the evidence with respect to the uncharged misconduct, we hold that it was relevant to prove opportunity and credibility. Nevertheless, because the parties raise several questions regarding the existence of a common scheme or plan, we first comment on its application to the facts of this case in light of recent Supreme Court decisions.

### 1. Common scheme or plan

Gomez's primary argument on appeal is that the Idaho Supreme Court's recent decisions in *Grist* and *Johnson* make clear that evidence that "a family member allegedly abused juvenile females, is irrelevant and inadmissible" as it does not demonstrate a common scheme or plan. He contends that following *Grist*, evidence of similar age and circumstances is insufficient to show a common scheme or plan. He further claims that *Johnson* sets forth what the State must establish to admit prior bad acts involving family members.

9

In *Johnson*, the defendant was charged with molesting his daughter, and the State sought to introduce evidence of prior bad acts allegedly occurring with his sister when they were both juveniles. *Johnson* quoted language from *Grist*, where the Court held that prior uncharged sexual misconduct may be admissible "if relevant to prove . . . a common scheme or plan embracing the commission of two or more crimes *so related to each other* that proof of one tends to establish the other, knowledge, identity, or absence of mistake or accident." *Johnson*, 148 Idaho at 668, 227 P.3d at 922 (quoting *Grist*, 147 Idaho at 54-55, 205 P.3d at 1190-91) (emphasis in original). *Johnson* explained the rule as follows:

> In other words, at a minimum, there must be evidence of a common scheme or plan beyond the bare fact that sexual misconduct has occurred with children in the past. The events must be linked by common characteristics that go beyond merely showing a criminal propensity and instead must objectively tend to establish that the same person committed all the acts.

*Johnson*, 148 Idaho at 668, 227 P.3d at 922. The *Johnson* Court held:

> The [trial] court identified the following characteristics that linked the current charged conduct to the prior bad acts to which [Johnson's sister] testified: (1) both victims were about seven to eight years old; (2) both victims viewed Johnson as an "authority figure" because he was an older brother or father; (3) both courses of conduct involved Johnson requesting the victim to touch his penis. These similarities, however, are sadly far too unremarkable to demonstrate a "common scheme or plan" in Johnson's behavior. The facts that the two victims in this case are juvenile females and that Johnson is a family member are precisely what make these incidents unfortunately quite ordinary. The prior acts are irrelevant and therefore inadmissible.

*Johnson*, 148 Idaho at 669, 227 P.3d at 923.

Gomez contends that this case is similar to *Johnson* because the allegation is that he, a family member, abused juvenile females, which, like *Johnson*, makes the alleged acts "unfortunately quite ordinary," and, therefore, irrelevant and inadmissible. We note that *Johnson* does not set forth any particular or unique standard with respect to family members. Indeed, if prior instances of misconduct were inadmissible solely because they involved a family member abusing juvenile females, a great deal of relevant evidence might be excluded. In *Johnson*, the fact that the defendant had a random, isolated encounter with his sister when they were both juveniles bore no relevance on the alleged conduct against his daughter. In other words, the events were not "linked by common characteristics that go beyond merely showing a criminal

propensity." *Johnson*, 148 Idaho at 668, 227 P.3d at 922. As such, the evidence was inadmissible.

In this case we note that the specific factual allegations regarding the uncharged sexual misconduct with other victims rise above the "generalized similarities" warned of in *Johnson*. The uncharged acts in this case do not involve unrelated, isolated instances of sexual misconduct from when Gomez was a juvenile, as was the case in *Johnson*. The uncharged acts with other victims and the charged conduct relating to V.B. bear remarkable similarities. Nevertheless, because we conclude that the evidence is relevant for opportunity and credibility purposes, we need not determine whether they are "linked by common characteristics that go beyond merely showing a criminal propensity and instead . . . objectively tend to establish that [Gomez] committed all the acts."[3]

## 2. Opportunity and credibility

In this case, the testimony of V.B.'s sisters and friend tended to prove that Gomez had the opportunity to commit the charged crime against V.B. Moreover, the testimony was relevant to V.B.'s credibility. The testimony elicited at trial indicated that V.B.'s biological parents had seven children together, and after V.B.'s mother and father were divorced, her mother, F.B., later

---

[3] Moreover, while we need not address the admissibility of V.B.'s testimony with respect to prior uncharged sexual misconduct, we note that her testimony was relevant for several purposes, including opportunity, credibility, and common scheme or plan. *See State v. Tapia*, 127 Idaho 249, 256, 899 P.2d 959, 966 (1995) (concluding that testimony of other instances of abuse occurring after the charged conduct was relevant because it reflected the defendant's common scheme or plan to use his girlfriend's influence over the victim, who was her granddaughter, to compel her to have sexual intercourse with the defendant, as well as to show why the victim waited several months to report the abuse); *see also State v. Scovell*, 136 Idaho 587, 590, 38 P.3d 625, 628 (Ct. App. 2001) (evidence of prior misconduct with victim regarding when and how the abusive behavior began allowed the jury to see the full picture, putting the victim's testimony in context, as well as giving the jury the ability to assess whether the victim was fabricating her story or telling the truth); *State v. Blackstead*, 126 Idaho 14, 19, 878 P.2d 188, 193 (Ct. App. 1994) (concluding that the uncharged criminal acts were in furtherance of an underlying plan to commit the charged crime where the uncharged act demonstrated a "continuing criminal design" to "groom" the victim by cultivating a relationship with her, inducing her into submission to his sexual demands, and procuring her silence through the use of drugs). In cases of sexual abuse, evidence of prior sexual misconduct with the victim is particularly relevant where it demonstrates a progression of abuse, as the conduct actually charged may be only a part of the process.

had five children with Gomez.[4]  From the time Gomez and F.B. started living together, they moved, incrementally, from a one-bedroom house to a four-bedroom house.  In each of their residences, there were always several individuals living with them, consisting, at various times, of their own children, F.B.'s children (V.B. and her siblings), some spouses and children of F.B.'s children, and other relatives.  Due to limited space, V.B. and her siblings often shared bedrooms, as well as beds.  She testified that, while in the four-bedroom house in Burley, she often slept in the living room, but she also slept in and shared a room with her brother.  She later shared the room with her sisters, S.B. and M.L.B., after they moved into the house.  Gomez testified, and V.B. acknowledged, that there were as many as twelve people living in that house at various times.

With respect to the charged conduct, V.B. testified that the touching occurred while she was sleeping in her room and sharing a bed with her brother.  Although apparently next to V.B. in bed while Gomez was touching her, her brother did not wake up and V.B. did not wake him up to stop Gomez or to tell him what had happened.  V.B. testified that she thought her brother was working nights at that time and that was the reason he did not wake up.  In spite of V.B.'s explanation, her testimony regarding this incident, by itself, raises issues of opportunity and credibility.  Moreover, Gomez denied ever touching V.B. inappropriately.  Based upon the nature of the charged offense and the surrounding circumstances in this case, opportunity and credibility were material and disputed issues concerning the crime charged.

Indeed, Gomez highlighted in his opening statement that the "essential point" of the whole case was "believability."  He argued it was unbelievable that he would go into V.B.'s room, touch her while her older brother slept next to her in the same bed, and talk to her in his regular voice, especially in a small home with so many people around.  Gomez aggressively challenged the validity of V.B.'s testimony on cross-examination, and questioned whether he could have had the opportunity to abuse V.B. in the presence of so many people.  Gomez argued in closing that V.B. testified the incident occurred in the morning, which meant there was "more chance that people are going to be walking around doing things."  He also argued that he (Gomez) would have to be the "stupidest man in the world" to "touch a 15-year-old girl" and

---

[4]     Their youngest child was born approximately one month before trial after Gomez had been arrested.

12

"talk[] in his regular voice about offering her money about this, about clothes, things such as that while a 17-year-old boy is laying next to her."[5] Gomez's defense theory was essentially that it would have been impossible for him to abuse V.B. in a small house full of people, particularly with a sibling sleeping right next to her.

It is evident that the questions of whether Gomez had the opportunity to engage in a lewd act with V.B. and whether her account could be believed were squarely before the jury. While not addressing the question of "opportunity," we find the Idaho Supreme Court's decision in *State v. Cardell*, 132 Idaho 217, 970 P.2d 10 (1998), instructive in our analysis of this issue. In that case, the defendant was a masseuse accused of committing a sexual battery on a sixteen-year-old client. The girl reported that during the massage, Cardell had her disrobe and then massaged her breasts and genital area and placed her hand near his groin. The district court allowed testimony from three former adult clients who described similar experiences. While the district court had focused on whether the testimony of the other massage clients tended to corroborate the testimony of the victim, the Court, reviewing the case de novo, held that the testimony was relevant to prove the absence of mistake or accident. *Cardell*, 132 Idaho at 219-20, 970 P.2d at 12-13.

The Court noted that the "issue of whether Cardell deliberately touched [the victim's] vaginal area was a material and disputed issue concerning the crime charged" because Cardell admitted to massaging the victim's breasts and inner thighs, which would have resulted in touching the outside of the vaginal area, but he denied ever directly touching or massaging her vagina. *Id.* at 220, 970 P.2d at 13. The Court held:

> The testimony of the adult massage clients was relevant to whether Cardell's touching of [the victim's] vaginal area was accidental. These women were asked at trial whether they believed that the touching of their vaginal areas by Cardell was accidental. The adult clients testified that they did not believe the touching was accidental during their massages. This testimony was relevant under I.R.E. 404(b) because it tends to show that any touching of [the victim's] vaginal area by Cardell during massage therapy was not a mistake or accident, *since other clients testified to similar touching*.

*Cardell*, 132 Idaho at 220, 970 P.2d at 13 (emphasis added).

---

[5] V.B. testified that her brother was eighteen years old at the time of the preliminary hearing, but that he was sixteen years old and she was fifteen years old at the time of the charged conduct.

While absence of mistake or accident is not an issue in this case, evidence of "similar touching" of prior victims was allowed in *Cardell* to demonstrate that the touching of the victim, in that case, was not accidental. Similarly, evidence of instances involving "similar touching" of V.B.'s sisters and friend demonstrates that Gomez had the opportunity to engage in that type of touching under uniquely similar circumstances to the instant case. At oral argument, counsel for Gomez conceded that opportunity was at issue in this case, but argued that V.B.'s sisters could have testified generally about Gomez's ability to access her room and perhaps find her alone without testifying about their own encounters with Gomez. However, the relevance of their testimony was not only Gomez's ability to access the room, but also his ability, in a house full of people, to surreptitiously enter V.B.'s bedroom, while she was sleeping next to her brother, to touch her and offer her money to sleep with him. Each of the girls was questioned at trial about how Gomez was able to get them alone. They testified that Gomez would capitalize on opportunities to catch the girls alone in a room, in the shower, or on the edge of a bed while everyone was sleeping. This testimony was necessary to explain how and why Gomez was able to abuse V.B. without anyone seeing the abuse, as her testimony, if considered alone, raised substantial questions as to how such abuse was possible in a house with little privacy. As stated in *Grist*: "Evidence of uncharged misconduct may not be admitted pursuant to I.R.E. 404(b) when its probative value is entirely dependent upon its tendency to demonstrate the defendant's propensity to engage in such behavior." *Grist*, 147 Idaho at 54, 205 P.3d at 1190. Here, as in *Cardell*, the testimony was not entirely dependent upon its tendency to demonstrate Gomez's propensity to engage in lewd acts. Rather, it was relevant under I.R.E. 404(b) because it tended to show that Gomez seized the opportunity to secretly touch V.B.'s breast and genital areas while she was sleeping, since other individuals testified that he had exploited other opportunities to engage in similar touching.

## C.    Prejudice

Gomez contends that, even if relevant, the evidence of other uncharged sexual misconduct should have been excluded under I.R.E. 403. Specifically, he argues that the evidence was "highly prejudicial and extremely cumulative," and that the jury was "overwhelmed with evidence of uncharged conduct," which likely resulted in Gomez being considered as "a man of bad character." The State responds that the district court did not abuse its discretion as it gave several limiting instructions instructing the jury on the proper use of the

evidence. A lower court's determination under I.R.E. 403 will not be disturbed on appeal unless it is shown to be an abuse of discretion. *State v. Enno*, 119 Idaho 392, 406, 807 P.2d 610, 624 (1991); *State v. Clark*, 115 Idaho 1056, 1059, 772 P.2d 263, 266 (Ct. App. 1989). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *Hedger*, 115 Idaho at 600, 768 P.2d at 1333.

We recognize that the testimony of V.B.'s sisters and friend was prejudicial. However, it was also highly probative in light of the unique circumstances of the charged conduct. As noted above, V.B.'s testimony regarding the charged conduct, by itself, raised legitimate questions about V.B.'s credibility and whether Gomez would have had the opportunity to abuse her. As such, the testimony regarding uncharged acts of sexual misconduct was particularly probative in order to demonstrate that Gomez had the opportunity to abuse V.B. in spite of the presence of other people and the resultant lack of privacy. As trial counsel argued, the essential point of the case was believability, and the circumstances of this case are unbelievable. It is arguably unbelievable that Gomez would enter V.B.'s room, touch her while her brother was sleeping next to her in the same bed, and carry on a brief conversation with her. Thus, the testimony of V.B.'s sisters and friend was highly probative as to whether V.B. was telling the truth and whether Gomez had the opportunity to abuse V.B.

We also note that the risk of unfair prejudice was diminished as the district court gave a limiting instruction relative to each witness who testified about instances of uncharged sexual misconduct. *See State v. Scovell*, 136 Idaho 587, 591, 38 P.3d 625, 627 (Ct. App. 2001) (holding that the risk of unfair prejudice was reduced by the trial court's instruction that the jurors were not to consider the uncharged acts as proof that the defendant had criminal propensities or behaved in conformity with them by committing the charged crimes). In these instructions, the court consistently stated that the question before the jury was whether there was a touching of V.B., not of anyone else. The court also instructed the jury that any other wrongs or acts, if believed, were not to be considered as evidence of Gomez's character or propensity to commit such acts and that they could only be considered for the limited purposes set forth in

15

I.R.E. 404(b). When instructing the jury prior to the last Rule 404(b) witness's testimony, the court stated: "I remind you that you can't use these other incidents as a propensity to do something or that this was what [Gomez] did and, therefore, what he did to [V.B.] he did in accordance therewith." The court similarly instructed the jury in the jury instructions. We presume that the jury followed the district court's instructions. *See State v. Kilby*, 130 Idaho 747, 751, 947 P.2d 420, 424 (Ct. App. 1997); *State v. Hudson*, 129 Idaho 478, 481, 927 P.2d 451, 454 (Ct. App. 1996).

In light of the highly probative nature of the testimony of uncharged sexual misconduct, as well as the district court's repeated instructions to the jury regarding the proper uses of such testimony, we cannot say that the court abused its discretion in allowing V.B.'s sisters and friend to testify regarding instances of previous sexual misconduct. We conclude that the district court appropriately balanced the probative value of the evidence of uncharged misconduct against the risk of unfair prejudice, and that Gomez has failed to show an abuse of the trial court's discretion.

### III.

### CONCLUSION

The testimony of V.B.'s sisters and friend was relevant to prove opportunity and credibility, and the district court did not abuse its discretion in admitting the evidence. Therefore, Gomez's judgment of conviction for lewd conduct with a minor child under sixteen is affirmed.

Judge MELANSON **CONCURS.**

Judge GUTIERREZ, **DISSENTING**

I respectfully dissent. Because the district court acted without the benefit of two recent Idaho Supreme Court decisions, *State v. Johnson*, 148 Idaho 664, 667, 227 P.3d 918, 921 (2010), and *State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009), in which the Supreme Court concluded that the admission of I.R.E. 404(b) evidence in child sex abuse cases is subject to the same analysis as the admission of such evidence in any other case, I would vacate the judgment of conviction and remand for a new trial.

In *Grist*, the Supreme Court set forth the new standard for admissibility pursuant to I.R.E. 404(b), requiring trial courts to first determine whether there is sufficient evidence to establish the other crime or wrong as fact, and whether the fact of another crime or wrong is

relevant to a material disputed issue concerning the crime charged, other than propensity. *Grist*, 147 Idaho at 52, 205 P.3d at 1188. The trial court must next engage in a balancing under I.R.E. 403 and determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Id.* The *Grist* Court highlighted the trial court's "discomfort with the status of I.R.E. 404(b) jurisprudence in Idaho," where the lower court stated: "I think that there has largely been a class of cases that have developed that are unique to sexual abuse cases. And I'm -- I think that I'm bound to follow that." *Grist*, 147 Idaho at 53, 205 P.3d at 1189. The Supreme Court then concluded:

> Although the district court was applying controlling precedent from the appellate courts of this state, the district court did not determine whether there was sufficient evidence to establish as fact Grist's prior uncharged sexual misconduct with [his ex-wife's daughter] nor did the district court articulate whether the evidence was probative because it demonstrated the existence of a common scheme or plan or because it tended to otherwise corroborate [the victim's] testimony.

*Grist*, 147 Idaho at 53, 205 P.3d at 1189. The Court declined to rule on the admissibility of the challenged evidence, leaving that determination for the trial court on remand. The Court did, however, instruct trial courts that they must "carefully scrutinize evidence offered as 'corroboration' or as demonstrating a 'common scheme or plan' in order to avoid the erroneous introduction of evidence that is merely probative of the defendant's propensity to engage in criminal behavior." *Id.*

The Idaho Supreme Court acknowledged that some of its previous decisions, *State v. Tolman*, 121 Idaho 899, 828 P.2d 1304 (1992), and *State v. Moore*, 120 Idaho 743, 819 P.2d 1143 (1991), had been "interpreted as creating an exception in child sex cases to the prohibition of character evidence." *Grist*, 147 Idaho at 51, 205 P.3d at 1187. While the Court criticized those decisions, it declined to overrule them in their entirety. Nevertheless, the Court emphasized that "the scope of evidence that may properly be admitted pursuant to I.R.E. 404(b) is no greater in sex crime cases than it is for any other type of case." *Id.* at 55, 205 P.3d at 1191. The Court concluded that because "the district court determined that the proffered evidence was governed by a body of law unique to sexual abuse cases," the judgment of conviction must be vacated and the case remanded for a new trial. *Id.*

In this case, the district court relied upon *State v. Phillips*, 123 Idaho 178, 845 P.2d 1211 (1993), in denying Gomez's motion to exclude I.R.E. 404(b) evidence. The *Phillips* Court

quoted extensively from *Moore* and *Tolman*, which have since been overruled in part.  The district judge noted that he was trial counsel for Phillips and that he argued the case at trial and on appeal.  Quoting large portions of *Phillips*, the judge stated that he did not think that *Phillips* had ever been overruled, and that he would "adhere to what they did in that case in this case." The judge later commented that the *Phillips* case "has never set well with this judge," stating:

> Counsel, they teach us in the evidentiary classes that they give new judges that there are no rules in sex abuse cases.  I don't believe that, but I recognize that it seems like lawyers that make your arguments are losing, [defense counsel], at this point in time.  And I have been there.
> . . . .
> It's a tough area of the law.  It's just a tough area.  I was --
> [Defense counsel], you argued with fervor; but I can assure you, so did I. I put my heart into this argument.  I thought it was grossly unfair in the *Phillips* trial that they could bring in witnesses that were molested years before, who made no criminal complaints.  I just thought that was an outrage, but the Supreme Court shot me down; and I'm under a duty to follow the law.

In this case, as in *Grist*, the district court did not articulate the reasons that the evidence was probative.  While this would not preclude an appellate court from affirming the lower court's admittance of challenged evidence, and while I do not necessarily disagree with the majority that the evidence may have some relevance, I conclude that because the district court perceived that there are "no rules in sex abuse cases," the appropriate remedy is to vacate the judgment of conviction and remand the case for a new trial.  This remedy would allow the district court the opportunity to consider the admissibility of the evidence in light of *Grist* and *Johnson*.[1]

The Supreme Court in *Grist* repeatedly cautioned trial courts to "carefully scrutinize" evidence offered under I.R.E. 404(b) for purposes of corroboration or as demonstrating a

---

[1]     I note that *Grist* and *Johnson* do not necessarily clarify the state of the law regarding the admissibility of evidence of prior sexual misconduct.  While it is clear that the same standard applies in child sex abuse cases as in any other case, the Court's refusal to overrule *Moore* and *Tolman* in their entirety raises a number of questions.  *Grist* and *Johnson* primarily address the question of admissibility of prior bad acts in the context of common scheme or plan.  The *Johnson* Court set forth three theories of how courts could require previous bad acts to be linked to the charged conduct in order to establish a common plan under Rule 404(b), but then declined to adopt any of those theories.  *Johnson*, 148 Idaho at 668 n.3, 227 P.3d at 922 n.3.  As such, there is still little guidance for trial courts addressing the question of whether some instances of prior sexual misconduct may be relevant in a child sex abuse case.  Nevertheless, remanding the case would still allow the court the opportunity to evaluate the admissibility of the evidence without the erroneous application of *Moore* and *Tolman*.

18

common scheme or plan. *Grist*, 147 Idaho at 53-55, 205 P.3d at 1189-1191. The *Grist* Court even noted its previous caution in *Tolman*, where the Court stated: "We do not suggest today that any and all evidence of prior sexual misconduct is admissible in sex crime cases merely by placing it under the rubric of corroborative evidence of a common scheme or plan." *Grist*, 147 Idaho at 54, 205 P.3d at 1190 (quoting *Tolman*, 121 Idaho at 905, 828 P.2d at 1310). This caution focuses on the importance of conducting a thorough relevance determination. Even relevant evidence, however, does not equate to admissible evidence. The *Tolman* Court did not limit its caution to the relevance inquiry, reminding trial courts that evidence of prior sexual misconduct "is still subject to the limitations imposed by I.R.E. 403." *Tolman*, 121 Idaho at 905, 828 P.2d at 1310. I wish to add my caution to trial courts engaging in the weighing under I.R.E. 403 of evidence of prior sexual misconduct.

Trial courts are charged with exercising their discretion in determining whether the probative value of relevant evidence of prior sexual misconduct is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *See* I.R.E. 403. When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989). While the district court has broad discretion in the admission and exclusion of evidence, *State v. Perry*, 139 Idaho 520, 521, 81 P.3d 1230, 1231 (2003), such discretion is not without limitation, *see State v. Medrano*, 123 Idaho 114, 118, 844 P.2d 1364, 1368 (Ct. App. 1992). The import and limitations of this discretion have been described as follows:

> [T]his is not a discretion to depart from the principle that evidence of other crimes, having no substantial relevancy except to ground the inference that [the] accused is a bad man and hence probably committed this crime, must be excluded. *The leeway of discretion lies rather in the opposite direction, empowering the judge to exclude the other-crimes evidence, even when it has substantial independent relevancy, if in his judgment its probative value for this purpose is outweighed by the danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial.* Discretion implies not only leeway but responsibility. A decision clearly

19

> wrong on this question of balancing probative value against danger of prejudice
> will be corrected on appeal as an abuse of discretion. [Emphasis added.]

*State v. Stoddard*, 105 Idaho 533, 537, 670 P.2d 1318, 1322 (Ct. App. 1983) (quoting McCormick, Handbook of the Law of Evidence § 190 (Cleary ed. 1972)).

I question whether trial judges in Idaho were "empower[ed] . . . to exclude the other-crimes evidence" in the wake of *Moore* and *Tolman*. Indeed, I question whether trial judges perceived that they had discretion at all to exclude evidence of prior sexual misconduct. While this discretion is committed to the trial courts, Idaho's appellate courts have not necessarily encouraged a thorough analysis under I.R.E. 403 in light of *Moore* and *Tolman*. *See e.g.*, *State v. Cross*, 132 Idaho 667, 671, 978 P.2d 227, 231 (1999) (holding that "[b]y following [the] . . . decisions in *Moore* and *Tolman*, the trial court acted within the boundaries of its discretion and reached its decision through an exercise of reason"); *State v. Spor*, 134 Idaho 315, 320, 1 P.3d 816, 821 (Ct. App. 2000) (holding that "[b]y following the reasoning in *Tolman* and *Moore*, the trial court acted within the boundaries of its discretion and reached its decision through an exercise of reason").[2] While I do not believe that *Moore* and *Tolman* meant to relieve trial courts of the requirement to conduct a balancing test under I.R.E. 403,[3] that may have been the practical effect in many subsequent cases. In other words, Idaho's appellate courts were complicit in perpetuating the incorrect assumption that where evidence of prior sexual misconduct was relevant under *Moore* and *Tolman*, such evidence automatically survived an I.R.E. 403 analysis and was admissible. As such, trial courts have been given little to no guidance on conducting a balancing test under I.R.E. 403 of evidence of prior sexual misconduct.

In setting forth the new admissibility standard, *Grist* offered some guidance, stating:

> "The prejudicial effect of [character evidence] is that it induces the jury to
> believe the accused is more likely to have committed the crime on trial because he

---

[2]    I do not suggest that trial courts are required to articulate an extensive I.R.E. 403 analysis on the record. However, such an articulation does provide a basis upon which an appellate court can consider whether the trial court abused its discretion. Nor do I suggest that appellate courts are required to set forth extensive analysis of the issue in each case. Some guidance, however, might be warranted.

[3]    Indeed, as noted above, *Tolman* explicitly stated that evidence of prior sexual misconduct "is still subject to the limitations imposed by I.R.E. 403." *Tolman*, 121 Idaho at 905, 828 P.2d at 1310. Nevertheless, that caution may have gone unheeded.

20

is a man of criminal character." *State v. Wrenn*, 99 Idaho 506, 510, 584 P.2d 1231, 1235 (1978). Character evidence, therefore, takes the jury away from their primary consideration of the guilt or innocence of the particular crime on trial. *Id.* The drafters of I.R.E. 404(b) were careful to guard against the admission of evidence that would unduly prejudice the defendant, while still allowing the prosecution to present probative evidence.

*Grist*, 147 Idaho at 52, 205 P.3d at 1188. In *State v. Pokorney*, 149 Idaho 459, 235 P.3d 409 (Ct. App. 2010), this Court relied upon *Johnson* in concluding that the trial court abused its discretion in admitting evidence of prior sexual misconduct. We stated:

> The Supreme Court, in *Johnson*, determined that the prior bad act evidence was irrelevant and did not, therefore, engage in a Rule 403 analysis. However, the *Johnson* Court did conduct a harmless error analysis and the Court's discussion of prejudice is instructive. In *Johnson*, the evidence of his crime was limited to the testimony from his daughter. *Johnson*, 148 Idaho at 669, 227 P.3d at 923. There was no physical evidence and the case hinged on the daughter's testimony. Thus, the testimony from Johnson's sister and father that he committed prior bad acts against his sister had an especially high risk of infecting the trial. Even though the trial court gave a limiting instruction for the sister's and father's testimonies, the Court found the error was not harmless. The Court stated: "Evidence of prior sexual misconduct with young children is so prejudicial that there is a reasonable possibility this error contributed to Johnson's conviction." *Id.* at 670, 227 P.3d at 924. "[A]dmitting such propensity evidence may reflect 'the unstated belief that sexual deviancy is a character trait of especially powerful probative value for predicting a defendant's behavior.'" *Id.* (quoting *State v. Field*, 144 Idaho 559, 569-70, 165 P.3d 273, 283-84 (2007)). "The danger is too great in this sex-abuse case that the jury may have believed the prior misconduct demonstrated Mr. Johnson's deviant character traits." *Id.*

*Pokorney*, 149 Idaho at 465-66, 235 P.3d at 415-16. We noted in *Pokorney* that while the challenged evidence was relevant as demonstrating consciousness of guilt, it also reflected to the jury the defendant's sexual deviancy. As such, we concluded:

> Particularly in light of *Grist* and *Johnson*, which, again, the district court did not have the benefit of, we must conclude that the district court erroneously balanced the probative value against the prejudicial effect of the evidence. Even with a limiting instruction, there was a high risk that the jury would convict Pokorney based upon propensity and sexual deviancy. We are constrained to conclude that the unfair prejudice substantially outweighed the probative value of the evidence. The district court's admission of the evidence was an abuse of discretion.

*Pokorney*, 149 Idaho at 466, 235 P.3d at 416.

Turning to the evidence in this case, I conclude that the overwhelming effect of the evidence of uncharged sexual misconduct was to emphasize to the jury Gomez's propensity to commit sex crimes. Gomez was charged with one crime, i.e., lewd conduct with V.B., consisting of one instance of touching and rubbing her breasts and vagina and offering her money to sleep with him. V.B. relayed her account of the charged conduct at trial. She also testified, however, regarding acts for which Gomez was not on trial, i.e., that Gomez had touched her on multiple occasions while she was sleeping, that he attempted to get into the bathroom while she was in the shower, that he made lewd comments to her, that he walked around in his underwear, and that he exposed himself to her. Each of V.B.'s sisters testified to similar encounters with Gomez, essentially testifying, without limitation, regarding any instance that they could recall. V.B.'s friend was also allowed to testify about her own alleged encounter with Gomez.

Following *Grist*, this Court, in *State v. Parmer*, 147 Idaho 210, 207 P.3d 186 (Ct. App. 2009), addressed the question of whether the trial court abused its discretion in concluding that testimony from eight Rule 404(b) witnesses was unduly cumulative. While we concluded, based upon the circumstances of that case, that the court did not abuse its discretion, we noted:

> The question of the number of witnesses testifying to prior bad acts is a matter of concern under Rule 403 analysis. Since the testimony is inherently prejudicial, at some point the number of such witnesses can become excessive and overwhelm the probative value of the evidence. This determination is left to the discretion of the trial court. The number of witnesses appropriate to establish a common scheme or plan, absence of accident or mistake, or intent will vary with each case. Thus, the issue cannot be resolved by drawing an arbitrary line. The Supreme Court in *Grist* held that trial courts must make such admissibility determinations on a case-by-case basis while remaining cognizant of the potential cumulative effect of the evidence and its tendency toward proving propensity and bad character. *Grist*, 147 Idaho at 52, 205 P.3d at 1188.

*Parmer*, 147 Idaho at 221, 207 P.3d at 197.

In this case, V.B. and five other witnesses testified regarding uncharged sexual misconduct. It is not only the number of witnesses, however, that must be considered. The number of instances of uncharged sexual misconduct that each witness intends to testify to is also important to consider under Rule 403 analysis. Gomez was forced to defend himself not only against V.B.'s accusations regarding one incident, but also against her testimony, as well as the testimony of her sisters and friend, regarding allegations beginning in 1996 and stretching through 2006. Essentially, Gomez had to challenge the credibility of each one of the accusing

22

witnesses.  As such, there was a high risk that the sheer amount of evidence of uncharged sexual misconduct took "the jury away from their primary consideration of the guilt or innocence of the particular crime on trial." *Grist*, 147 Idaho at 52, 205 P.3d at 1188.  In spite of the court's limiting instructions, it is difficult to imagine how the jury could confine their deliberations to the single crime charged when multiple crimes involving six different witnesses were testified to at trial.  I acknowledge that some of the I.R.E. 404(b) evidence may have even been highly probative.  However, in exercising their discretion, trial courts must be vigilant in guarding against the danger of a jury convicting a defendant, not for the crimes for which he stands trial, but for a multitude of crimes for which he has never even been charged.  Because there is such a danger in this case, and because the district court did not have the benefit of recent case law in making its Rule 403 determination, I would vacate the judgment of conviction and remand for a new trial.