IN THE SUPREME COURT OF THE STATE OF IDAHO

Docket No. 38936

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | Twin Falls, November 2011 |
| Plaintiff-Respondent, | ) | |
| | ) | 2011 Opinion No. 60 |
| v. | ) | |
| | ) | Filed: March 23, 2012 |
| JAMES FREDRICK PEPCORN, SR., | ) | |
| | ) | Stephen W. Kenyon, Clerk |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Minidoka County. Hon. R. Barry Wood, District Judge.

The judgment of the district court is <u>affirmed</u>.

Roark Law Offices, Hailey, for appellant. R. Keith Roark argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. John C. McKinney, Deputy Attorney General, argued.

———————————————————

BURDICK, Chief Justice

This case concerns Appellant James Fredrick Pepcorn, Sr.'s petition for review from the Court of Appeals decision finding error in two cases against him that were consolidated at trial. After a harmless error analysis, the Court of Appeals decided that the error in one of the cases was harmless error, but was not in the other case. In resolving the appeal, we directly address the issues at the trial court level regarding the introduction of Idaho Rules of Evidence Rule 404(b) evidence. We conclude that the admission of 404(b) testimonial evidence was not in error.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant James Fredrick Pepcorn, Sr. (Pepcorn) was found guilty and charged with two counts of lewd conduct, two counts of sexual abuse of a child, and one count of rape in a consolidated trial in Minidoka County. Both victims were nieces by marriage. One of the nieces, A.R.G., testified that Pepcorn had digitally penetrated her after a four-wheeler ride in the middle of a field, and that on a subsequent visit to his farm, Pepcorn anally raped her in his

1

bedroom. These events took place in 1992 or 1993, when A.R.G. was six or seven years old. The other niece, A.J., testified that Pepcorn had touched her bottom and breasts during hugs; grabbed her crotch and bottom and massaged her vagina while lifting her up onto horses; and, ran his hand up her thigh, close to her vagina, after he asked her to sit on his lap while they were watching television. These events took place close to 1995, when A.J. was twelve or thirteen years old.

On May 10, 2007, the Information was filed for the counts committed against A.R.G., lewd conduct with a minor child under sixteen, pursuant to I.C. § 18-1508, and rape, pursuant to I.C. § 18-6101. On October 16, 2007, Pepcorn waived his right to a speedy trial and the parties stipulated to vacate and reschedule the jury trial set for the counts involving A.R.G. upon the belief that further charges would most likely be brought against Pepcorn. On March 10, 2008, the Information was filed for the counts committed against A.J., two counts of sexual abuse of a child under the age of sixteen years, pursuant to I.C. § 18-1506, and lewd conduct with a minor child under sixteen, pursuant to I.C. § 18-1508.[1] Subsequent to the filing of the Information in the second case, a motion was filed in both cases seeking consolidation. Notice was also filed of the State's intent to introduce evidence pursuant to I.R.E. 404(b). The notice listed seven individuals related to Pepcorn that had allegedly been victims of sexual abuse, sexual contact, or lewd conduct.

During the hearing regarding the motions for consolidation and admission of 404(b) evidence, Pepcorn's pre-trial counsel objected early on in the hearing on the grounds of there being different victims, different cases, unconnected acts or transactions, at dissimilar times, and no common questions of fact. Later, counsel objected to the consolidation on similar grounds and further because the incidents were reported at different times and the victims were different ages at the time of the incidents. Additionally, objections were made regarding the 404(b) issue based on the different types of conduct and different sex of some of the witnesses and defense counsel asked for the court's permission to brief the issue further.

The district court decided that it would allow the 404(b) evidence, ruling that the offenses were similar and were admissible for purposes other than propensity, namely because the evidence was relevant to show a common plan or scheme "to sexually abuse an identifiable

---

[1] According to counsel at a May 19, 2008 hearing, the reason why the cases were not filed together was because law enforcement did not become aware of, or investigate the additional allegations until later.

group of young persons, many of whom are approximately the same age, with whom the defendant is related, and with the defendant has access to by reason of his familial and blood relationship." The district court also found the evidence relevant for purposes of credibility, and further for showing motive, opportunity, and preparation.[2] The court next considered whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, finding that the probative value thereof increases just by the number of witnesses and volume of testimony, but that it was not outweighed by unfair prejudice.

Based on similar reasoning, the court also decided in favor of consolidation because of "clear evidence here of a common plan or scheme to abuse these relatives of all approximately the same age group." At a later hearing concerning an additional witness listed on the notice of intent, the court further explained that it was ordering consolidation because "it seems to me that all of the witnesses would be identical in each of the two trials" and those that were not, could be handled by a limiting instruction. The court also gave further reasoning for its decision regarding consolidation: (1) there would be little risk that the jury would be confused between the five different counts/allegations; (2) the jury would be given instructions to find all material elements of the crime charged for each allegation; and (3) the jury was going to essentially hear the same evidence for each case.

On May 19, 2008, a second notice of intent to present 404(b) evidence was filed. The notice listed three more individuals related to Pepcorn that had allegedly been victims of sexual abuse, sexual contact, or had witnessed Pepcorn making sexual contact with another person within the identifiable class.

The 404(b) testimony heard during the pre-trial hearings and eventually at trial consisted of testimony from six of the individuals initially listed in the notices. Two of the witnesses that testified were two of the daughters of Pepcorn's wife's older sister. The older of the two nieces testified that at the time Pepcorn was living in their basement in Ogden, Utah, and was an instructor for summer night courses at Weber State University. She testified at trial to an event that took place over forty years prior to her testimony.

> **A.** Yeah, there was a time when [the sisters took turns and] went . . . with him when he was teaching. . . . At the college.

---

[2] At trial, the instructions given to the jury before hearing the witnesses asked them to consider the evidence "only for the limited purpose of proving the defendant's motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident." The trial court decided not to include credibility.

3

**Q.** Do you remember what you were wearing?

**A.** Yeah, we had to wear dresses.

**Q.** And tell us about that. How do you remember you were wearing a dress?

**A.** We had to dress for school. Mom told us that we needed to . . . wear a dress, because we were going to school. . . .

. . .

**Q.** When you went to Weber State with the defendant, how did you go there?

**A.** In a vehicle.

. . .

**Q.** I'm sorry, do you remember what kind?

**A.** Car, truck, I don't know what kind it was. I know it had a bench seat.

. . .

**Q.** Was anybody else in the vehicle with you and the defendant?

**A.** No.

**Q.** Did anything happen in that vehicle that you remember now?

**A.** Yeah. When we were pulled out of the driveway and we were headed toward the college, [Pepcorn] told me that the door was broken and that it might come open, and that I needed to slide over away from the door, so I slid a little bit.

. . .

**Q.** What happened after you slid over?

**A.** He grabbed my arm and slid me over closer to him.

**Q.** What happened after he slid you over closer?

**A.** He put his hand on my leg.

**Q.** Where on your leg?

**A.** On my thigh above my knee.

**Q.** What did he do with his hand there?

**A.** Just sat there for a few minutes. And then grabbed my hand and put it on his leg, and—

**Q.** Where on his leg did he put your hand?

**A.** It was his upper thigh.

**Q.** Do you remember if he did anything with your hand on his upper thigh?

**A.** No, he let go of it, left it there.

**Q.** What happened after he let go of that?

**A.** He slid his hand under my dress.

**Q.** Where under your dress?

**A.** Into the elastic leg of my underwear.

**Q.** And what did he do after that?

**A.** He started touching my private parts.

**Q.** And I have got to ask you to describe to the jury what you remember about that specifically, about that touching.

4

**A.** I was uncomfortable. I just—you know, I was shaking, nervous, didn't know what to say or do. He told me to slide down a little and spread my legs apart a little, and then he put his finger inside my vagina and moved it in and out.
. . .
**Q.** Do you remember feeling any physical pain?
**A.** Yeah, it hurt. I think I told him that it hurt.
**Q.** And do you know how long that touching lasted?
. . .
**A.** Yeah, maybe 15 minutes; 15, 20 minutes.
**Q.** . . . Again, can you estimate how old you were when that occurred?
**A.** . . . I was probably seven years old at the time.

The younger niece testified that when she was between two and five years of age, in proximity to the time her sister testified, that she had been subject to a similar event.

I remember going for a ride with [Pepcorn].  I remember we were in a . . . truck.  He told me I had to slide over, because the door would fall open and I'd fall out.  And I slid over a little, and he . . . pulled me over by him.
. . .
I remember he put his hand down my pants.  I remember he put his finger into my vagina.

Another niece, a daughter of Pepcorn's wife's younger sister who is a sister to A.J. and a first cousin to A.R.G., testified that about thirteen to nineteen years prior to the time at which she testified, when she was between seven and thirteen years old, Pepcorn touched her breasts when they hugged on visits to Pepcorn's farm.  She also testified at trial to other events that occurred at Pepcorn's farm.

**Q.** Do you recall any kind of inappropriate behavior or conduct with your Uncle Jim that occurred during any kind of a horseback ride?
**A.** Yes, there was one specific time where . . . my mom had told us that we were going to go up to see my Aunt Linda . . . .  We went up to the farm.  And [Pepcorn] had asked us if we wanted to ride the horses . . . .  There was one horse. My uncle had put all three of us girls, Laura, myself, and Amy onto the horse. And as he lifted me up onto the horse, he used my vagina to lift me up. I can remember how bad it hurt because of the pressure.  It felt like his fingers dug in. Once he got me onto the horse, he did leave his hand on my vagina, and he moved his fingers side-to side, and then he pulled away.
**Q.** Do you know approximately how old you might have been when that happened?
**A.** I was probably about 10 or 11.
. . .
**Q.** Do you remember how often you got to ride the four-wheeler at the Pepcorn place?
**A.** I rode it a lot.
**Q.** And when you rode the four-wheeler, who did you ride with?

5

**A.** I would have rides with [Pepcorn]. . . .

**Q.** When you rode with [Pepcorn], do you remember where you sat?

**A.** Yes, a couple times, I sat in the front

**Q.** Does that mean that you also sat in the back?

**A.** Yes.

**Q.** Do you recall who decided where you sat on the four-wheeler?

**A.** My Uncle Jim.

**Q.** What, if anything, that was inappropriate happened on the four-wheeler?

**A.** I can remember a couple of times when he had me sit in front of him. Once we got around to the back of the shed when nobody was in sight, he put his hand on . . . my inner thigh and slowly moved it up to my vagina, and then he let his hand rest on my vagina and then did move his fingers.

**Q.** Was that on top of your clothing or under?

**A.** On top.

**Q.** How many times did that happen?

**A.** I can remember two times.

**Q.** And describe the other time.

**A.** The other time was pretty much identical with the other.

Three brothers of Pepcorn's wife also testified. Each of them testified to incidents that happened approximately 32 to 42 years prior to testifying, when they were between the ages of six and fourteen. Each of the brothers testified that Pepcorn touched and stroked their penises, and that Pepcorn made them touch and stroke his penis. The oldest brother, and A.R.G.'s father, testified that the first event took place when he was eleven years old while camping with Pepcorn near Stanley. One night he woke up and Pepcorn was "fondling" his penis. He stated that Pepcorn caused him to ejaculate. The older brother testified further to additional instances:

**Q.** Is that where the sexual contact with Jim ended?

**A.** No. It carried on for a while. Like I said, we'd go swimming, and that continued. I'd go duck hunting and spend the night at his grandmother and grandfather's house, and it would go on there. . . . And he would ask me to fondle him after he would fondle me. And I wasn't comfortable at all with that, but because I was able to hunt and fish and go out and do things, then I just kind of went with that.

**Q.** How old were you, about, when it finally stopped?

**A.** I don't know. I can't remember. But I wasn't older than 12, I don't think. . . .

**Q.** When you talked about it happening when you went swimming—

. . .

**Q.**—you mean that it happened at the swimming pool or somewhere else?

**A.** In between. Usually on the way, after he excused the [boy scouts that Pepcorn was the scout leader for]. I don't know, it seemed that he and I were the only ones in his vehicle, usually; and the other boys had a means to get to the

6

swimming pool aside from [Pepcorn]. I don't remember anyone else going with us, so it usually just happened on the way out, back home.

. . .

Q. And how—how did it come to be that you were close enough to him in the truck for it to happen?

A. Well, you know, the initialization, it's very vague. . . . I can't remember the dialogue, you know, by words. I can just remember going down a dark road until I would ejaculate, and then . . . I was, you know, put to the task to cause him to ejaculate.

. . .

Q. The sexual activity in the pickup truck that happened on the way back from the swimming pool, can you estimate how often that happened, or is that too difficult to do?

A. No. It was about once a week.

Q. Over what kind of a period of time?

A. Well, I can't remember the length of time, but it was—it had to have been over a year.

Q. You made reference to some things that happened when you were duck hunting?

A. What—We'd leave early in the morning, so I'd stay at his grandmother's and grandfather's home there in Ogden, and we'd get up early and go. And I would sleep in his bed with him, and we'd go through this—this fondling back and forth.

Q. The same type of touching?

A. Yes.

Q. And as far as when this happened while you were hunting, how many times do you think that happened?

A. I can't put a number on it. It wasn't—it wasn't dozens of times. It was, you know—I'd have to—I can't really put a number of times on that. Over a couple of years, I guess. Maybe seven or eight times, maybe. I don't know. I can't remember.

A younger brother testified that the earliest incident that he could remember of Pepcorn acting inappropriately occurred at a hot springs near Pepcorn's cabin when he was approximately five years old.

[Pepcorn] and I got undressed and got into the [hot springs], and [Aunt] Linda was in the dressing room. When we were in the [hot springs], I sat on his knee, and he fondled my penis at that time.

The next incident this brother remembered happened in the brothers' home when he was six or seven years old and included the youngest brother who was four or five at the time.

And [Pepcorn] had [the youngest brother] and I sit down on a bench, and he told us to take our pants off and our underwear and just start to fondle each other's penises, and he watched.

7

Additionally, this brother testified to other incidents at the hot springs where Pepcorn would fondle the boy's penis and would "take [the boy's] hand and place[] it down on his penis." After this brother pulled his hand away, Pepcorn "pulled [the boy's] hand back down there, put it on his penis," with "his hand wrapped around [the boy's] hand, wrapped around his penis." Pepcorn then "moved [the boy's hand] up and down." The brother also testified he attended a Boy Scout winter camp, where Pepcorn was a scoutmaster, when he was eight or nine years old. The brother testified that during the evening, "[Pepcorn] fondled my penis; and he put my hand on his and held it there, and moved it up and down until he ejaculated." On another occasion when this brother was nine, an incident happened in Pepcorn's truck where Pepcorn "unbuttoned my pants and took my penis out and started to fondle it." And then Pepcorn "took his penis out of his pants and put [the boy's] hand on it, and [the boy] pulled it away."

The youngest brother testified to similar incidents including times during the holiday season when Pepcorn came into the boys' bedroom and touched his penis. The youngest brother also recounted an incident where the three brothers were riding in Pepcorn's truck and Pepcorn "started touching the penis area of my brother over the pants. And then he instructed [the brothers to do it to each other]; and we were all supposed to be there touching each other." Also, the youngest brother testified to an incident where he and a brother assisted Pepcorn with plowing a field. Each brother would take a turn on the tractor to help Pepcorn manually turn the plow. While on the tractor, Pepcorn "opened [the boy's] pants" and touched him "on the penis again." At this time, while Pepcorn was touching the boy's penis, he told the boy that his brother liked when Pepcorn touched his penis, and also asked him if his female cousins (also related to Pepcorn by marriage) would do that to him. Also, one year near Easter, Pepcorn took some of the children to a cabin and the youngest brother was forced to sleep in Pepcorn's bed, where Pepcorn "played with [the youngest boy] until [the boy] ejaculated." The youngest brother also testified that Pepcorn made him touch Pepcorn's penis as well.

> **Q.** In all of these incidents you have described [Pepcorn] touching you, did you ever touch him?
> **A.** He forced me to touch him.
> **Q.** When?
> **A.** In the bed at night
> . . .
> **Q.** Tell me about that.
> **A.** Well he took my hand and placed it on his penis and was stroking it, and told me to 'stroke it like this.' And I tried to pull my hand away, but he kept

it there and said, 'stroke it hard, harder.' And he took my wrist and was helping me do it. And then everything was all wet, and that was it.

Finally, the youngest brother testified that Pepcorn had tried to touch his penis as late as age twenty-two during a camping trip.

The youngest brother also testified that years later he met with Pepcorn and Pepcorn's clergyman, a LDS bishop, to discuss the abuse in 1998 or 1999. The oldest of the brothers, A.R.G.'s father, was also invited to the meeting but chose not to attend. After the youngest brother shared about all of the incidents at the meeting, he testified that Pepcorn had responded by saying:

> I molested all of your family, all of you kids. You all wanted it. And your sister . . . wanted me to give it to her.
> . . .
> My wife hasn't had sex with me for a long time, and I have to have it with somebody, either with me or with somebody else.

This testimony regarding the meeting with Pepcorn's bishop was shared at a pre-trial hearing and on rebuttal at trial after Pepcorn testified about the meeting yet denying that he had ever said that his wife's "whole family wanted to be molested."

Of those that did not testify at the earlier hearings, a nephew, A.J.'s brother, testified at trial that he had witnessed Pepcorn touching his sister when helping her onto a horse.

> **A.** I was waiting my turn to ride. [A.J.] was going to ride first. And when he helped her onto the horse, he . . . had one arm on her shoulder and picked her up by her crotch.
> **Q.** Did you see anything happen when he did that with his hand?
> **A.** Well, I noticed that he held her there for quite a while before—kind of lifted her in the air and then paused, and then put her on the horse. And I remember seeing [A.J's] face in a real panic, and I felt very uncomfortable at what I saw.
> **Q.** Did you see whether he did anything with his hand when it was there on her crotch?
> **A.** Well, as he lifted her on the horse, his hand just moved from front to back as he placed her on the saddle. From the front of the crotch to the back.
> **Q.** What about that made you uncomfortable or bothered you?
> **A.** Mostly, when I first saw it, I . . . assumed that was the way you lifted children on the horse. But when I saw [A.J's] face, I knew that she was extremely distraught.
> **Q.** Did you understand why?
> **A.** Yes.
> **Q.** Do you recall when you were younger, whether you were ever lifted onto the horse?
> **A.** I was never lifted onto the horse in that manner.

Also, another niece testified at trial in rebuttal to Pepcorn's testimony that he did not act inappropriately with any minors after the mid-1970s. She testified that between the ages of twelve and sixteen, sixteen to twenty years prior to the testimony, Pepcorn touched her breasts during hugs.

> I was forming breasts at the time, and he really liked to hug. He liked to hug me a lot. It just wasn't hello and goodbye. He would, when he would hug me, he would feel my breasts at the end of the hug.

Prior to each of the 404(b) witness' testimony and at the conclusion of the jury trial, the district court instructed the jury of the limited purposes of the testimony and that the evidence was not to be considered to prove "the defendant's character or that the defendant ha[d] a disposition to commit crimes."

At trial, both victims testified, and all but one of the witnesses listed in the notices of intent to introduce 404(b) evidence testified.

Pepcorn was found guilty of all counts and sentenced to concurrent terms of indeterminate life with twenty years fixed in A.R.G.'s case, and concurrent unified terms of fifteen years with five years determinate for the two sexual abuse counts and indeterminate life with twenty years fixed for the lewd conduct count in A.J.'s case. Pepcorn appealed the decision by the district court to allow the 404(b) evidence at trial.

## II. STANDARD OF REVIEW

When reviewing a case from the Court of Appeals, this Court gives serious consideration to the Court of Appeals' views, but will review the trial court's decision directly. *State v. Field,* 144 Idaho 559, 564, 165 P.3d 273, 278 (2007). Ultimately, this Court acts as if the appeal was directly from the trial court's decision. *Id.*

Whether evidence is relevant is a question this Court will review de novo, but an abuse of discretion standard is used when reviewing a trial court's decision to admit evidence. *State v. Shutz,* 143 Idaho 200, 202, 141 P.3d 1069, 1071 (2006). A three point inquiry is used to determine whether a trial court has abused its discretion: (1) whether the court correctly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason. *State v. Perry,* 150 Idaho 209, 218, 245 P.3d 961, 970 (2010).

10

## III. ANALYSIS

**A. The trial court did not err by allowing the testimony of alleged prior, uncharged sexual conduct of Pepcorn to be presented at trial.**

Pepcorn argues that the district court impermissibly allowed evidence of prior, uncharged acts of sexual conduct as evidence in his trial. The State argues that the evidence was relevant in demonstrating Pepcorn had a common scheme or plan to sexually abuse young children related to him by marriage.

Before trial, the district court held a hearing for six witness accounts of prior uncharged sexual conduct of Pepcorn to determine whether the testimony would be allowed pursuant to I.R.E. 404(b).[3] Two of Pepcorn's nieces each testified to separate incidents approximately forty years ago when Pepcorn and his wife lived in the basement of their family's home in Utah. Both testified that Pepcorn had placed his hand underneath their dresses and digitally penetrated their vaginas after inviting them to ride along with him in a vehicle and asking them to sit next to him; one niece testified that this happened when she was between the ages of six and eight and her sister testified that she was between the ages of two and five.

Another one of Pepcorn's nieces, A.J.'s sister and A.R.G.'s first cousin, testified that on family visits to Pepcorn's home approximately fifteen to twenty years prior when she was between the ages of seven and thirteen that Pepcorn would run his hand up her side and touch her breasts when he hugged her. She also testified that when she rode horses at his farm, Pepcorn helped her onto the horse by placing a hand on her vagina and then move his fingers. Also, Pepcorn placed his hand on her thigh then slowly move it up to her vagina and let it rest there as she rode in front of him on four-wheeler rides.

The final witnesses testifying at the hearing were the three brothers of Pepcorn's wife. Each testified to separate incidents where Pepcorn touched their penises and either Pepcorn manually ejaculated one of the brothers or made them manually ejaculate Pepcorn. One of them also testified that Pepcorn made him touch his brother's penis as well. One brother testified that the incidents happened to him between the ages of eleven and thirteen. Another testified the incidents happened when he was between the ages of six and fourteen, and the last brother testified that he was between the ages of four and thirteen when these incidents occurred. He

---

[3] The district court also heard arguments regarding the State's motion to consolidate the two cases. Pepcorn has not listed the consolidation of the cases as an issue on appeal.

also testified that Pepcorn later attempted to touch his penis while camping when he was twenty-two years old. These incidents occurred between 32 and 42 years prior to the testimony.

This youngest brother also testified that he met with Pepcorn and Pepcorn's LDS bishop in 1998 or 1999 to discuss the sexual acts committed against him by Pepcorn. In response to the recounting of the prior acts against the youngest brother, Pepcorn stated that:

> I just touched you kids because you wanted it. Your sisters wanted it. Your whole family wanted it. Your sister wanted me to give it to her. My wife won't have sex with me anymore. I have to have it with somebody else, whether it be [sic] with me or somebody else, myself or somebody else.

During the hearing, the district court twice ruled that the testimony was admissible for trial. For the initial decision, the district court first looked at the questions of remoteness and similarity, recognizing that the more remote a prior act was it would require more similarity. After analyzing one of the witnesses that was most similar to the charges alleged by A.J., the district court then entered into a relevancy analysis.

> The court is required to conduct a two-tiered analysis, and the court must determine whether the proffered uncharged misconduct of the sexual nature as described by the five witnesses here today is relevant for a purpose other than propensity, and it's a two-tiered analysis.
> . . .
> The evidence must be admissible for purposes other than propensity; and those purposes include proof of motive, opportunity, intent, preparation, identity, or general plan or scheme. That's Idaho Rule of Evidence 404(b).
> Whether evidence is relevant, and relevant evidence is defined by Idaho Rule of Evidence 401. That rule provides the definition of relevant evidence, again, which is a question of law, but describes−or defines relevant evidence as being−it means: 'Evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' And clearly, the prior sexual conduct testified here to today by these five respective witnesses, under the definition of relevant evidence, I would make a finding of law that it is relevant evidence.

The district court then stated that the proffered testimony was relevant for a "variety of reasons." The court found the testimony relevant to show a "common plan or scheme to sexually abuse an identifiable group of young persons, many of whom are approximately the same age, with whom the defendant is related, and with whom the defendant has access to by reason of his familial and blood relationship." The district court also found the testimony relevant for absence of mistake and for the purpose of showing motive, opportunity, and preparation.

12

Next the district court entered into an unfair prejudice analysis, stating that the question of prejudice takes on a different tone than it had been accustomed to because of the amount of testimony by "so many people of so many events."

> So what the court's faced with here is not so much a question of . . . the probative value. Because . . . there's so much of it, it's a question of is there so much of it that it, in and of itself, becomes prejudicial.
> I have never faced that before, frankly. Never even heard of it in a context like this. I have where there's been like evidence that the—that a defendant abused the same victim twice a week for ten years, so you have hundreds of events involving these same two people or something like that; but here you have these . . . relationships, both male and female, all about the same age group or within a reasonable amount of age range, beginning at age 6 up to . . . 14 or so . . . various times, various places. It's pretty remarkable.
> . . .
> Clearly, it's relevant and admissible.
> . . .
> The amount of the alleged incidents, the probative value increases just by the sheer number and the sheer volume.
> . . .
> But I would make the determination that it's legally relevant and it is admissible; and that at least some of it, if not all of it, the probative value is not outweighed by the unfair prejudice.

The district court revisited this ruling after the youngest brother's testimony, which included Pepcorn's statement that his wife's entire family "wanted it." The district court first corrected the statement from his earlier finding that the witnesses were all blood relatives by stating that they were all related to Pepcorn by marriage, all being blood relatives of Pepcorn's wife. Next, the district court stated that this was "that identifiable group with the opportunity, intent, motive and so forth that brings it into the realm of the 404(b) conduct."

Idaho Rule of Evidence 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that the prosecution in a criminal case shall file and serve notice reasonably in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

The admissibility of evidence offered for I.R.E. 404(b) purposes must pass a two-step analysis. *State v. Johnson*, 148 Idaho 664, 667, 227 P.3d 918, 921 (2010); *State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009). First, the evidence of prior misconduct must be sufficiently

13

established as fact and relevant as a matter of law to a material and disputed issue other than the character or criminal propensity of the defendant. *Johnson,* 148 Idaho at 667, 227 P.3d at 921; *Grist,* 147 Idaho at 52, 205 P.3d at 1188. For the second step, there must be a determination under I.R.E. 403 regarding whether the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Johnson,* 148 Idaho at 667, 227 P.3d at 921; *Grist,* 147 Idaho at 52, 205 P.3d at 1188.

Reliability is important to the relevance analysis because 404(b) evidence can only be relevant "if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Grist,* 147 Idaho at 52, 205 P.3d at 1188. Here, the trial court found that the evidence was reliable, and the record defends this finding, because Pepcorn himself had apologized later to one of the victims, and Pepcorn in the trial admitted to many of the prior incidents.

As for relevance, the district court found here that the testimony was relevant because it tended to show a common plan or scheme to sexually abuse an identifiable group of related young persons of either sex. This Court has cautioned the use of the "common plan" rubric. *See Grist,* 147 Idaho at 53, 205 P.3d at 1189 ("[T]rial courts must carefully scrutinize evidence . . . demonstrating a 'common scheme or plan' in order to avoid the erroneous introduction of evidence that is merely probative of the defendant's propensity to engage in criminal behavior."); *State v. Field,* 144 Idaho 559, 570, 165 P.3d 273, 284 (2007) ("[T]here must be limits to the use of bad acts evidence to show a common scheme or plan in sexual abuse cases.") The requisite level of relevance must be more than "the bare fact that sexual misconduct has occurred with children in the past." *Johnson,* 148 Idaho at 668, 227 P.3d at 922. This Court has often stated, and it bears repeating, that 404(b) evidence should only be admitted if "relevant to prove . . . a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, knowledge, identity, or absence of mistake or accident." *Id.* This statement of law is appropriate in the vast majority of cases involving the presentation of 404(b) evidence. These are the instances where there is no direct evidence of the existence of a common design. In such cases, trial courts are obligated to evaluate whether the offenses bear such a resemblance to the charged offense that the existence of a common plan may legitimately be inferred. However, in a minority of cases, there will be direct evidence demonstrating the existence of the common design. The present appeal presents such a case. In this case, the statements attributed to Pepcorn identify the group that he targeted for sexual

14

contact (his wife's family members) and his motive for targeting that group (his wife's refusal to engage in sexual relations). The district court did not err in determining the 404(b) evidence to be relevant.

If the common scheme or plan rubric is to be used, there must be common characteristics that go "beyond merely showing a criminal propensity." *Id.* Here, there is testimony that Pepcorn himself stated that his wife's entire family wanted to be touched and that since his wife would not have sex with him, he had "to have it" with someone. This shows a definite plan for sexual conduct with members in his wife's family that goes beyond a showing of criminal propensity. The testimony of the statement made by Pepcorn also goes to the motive behind the plan. "Motive is generally defined as that which leads or tempts the mind to indulge in a particular act." *State v. Stevens*, 93 Idaho 48, 53, 454 P.2d 945, 950 (1969). The testimony shows motive—that Pepcorn's wife would not have sex with him and that he looked for it elsewhere. Pepcorn's own words show that he then selected a specified group with whom he could have sex. A common plan of sexual misconduct with the same group of correspondingly aged children of both sexes that were related to his wife is clearly established by the evidence in this case.

Over a span of forty years, Pepcorn targeted the members of his wife's family that he came into contact with; his wife's siblings, and their children. Although many witnesses testified at trial against Pepcorn, they were necessary to show that they were part of a common plan that was so related to each other that they tend to establish the commission of the crimes against his nieces in this case. *See Johnson,* 148 Idaho at 668, 227 P.3d at 922.

A large number of witnesses testifying to similar uncharged conduct by a defendant will always present the danger of unfair prejudice. The concern is that jurors may conclude that "[i]f he did it before, he probably did it this time as well." This is the impermissible "propensity" inference that I.R.E. 404(b) attempts to address. *Grist,* 147 Idaho at 54, 205 P.2d at 1190. In the present case, however, the district court repeatedly instructed the jury, both orally and in writing, that the evidence was admitted for a limited purpose and could not be considered for purposes of demonstrating that Pepcorn had a propensity to commit crimes. "We presume that the jury followed the jury instructions given by the trial court in reaching its verdict. . . ." *State v. Carson*, 151 Idaho 713, __, 264 P.3d 54, 59 (2011) (citing *Phillips v. Erhart,* 151 Idaho 100, 109, 254 P.3d 1, 10 (2011)). In view of these instructions, and recognizing that this is the

15

unusual instance where the defendant made statements identifying the targets of his criminal behavior and his reasons for targeting these individuals, we are unable to conclude that the district court abused its discretion when it found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

The two victims in this case were Pepcorn's nieces, one a daughter of his wife's sister, the other a daughter of his wife's brother. Not only were the victims similarly related as the 404(b) witnesses, but they each testified to sexual misconduct that was in many ways similar to the misconduct testified to by the other family members. A.R.G., testified that Pepcorn took her on a four-wheeler ride and made her pull down her pants and underwear and then digitally penetrated her vagina when she was approximately six years old. Two of the witnesses, also Pepcorn's nieces, testified to being digitally penetrated by Pepcorn when they were approximately the same age. The three brothers also testified that at similar ages Pepcorn started touching their penises in an attempt to get the boys to ejaculate. A.J. testified that Pepcorn touched her breasts and held her buttocks during hugs and also grabbed her crotch and massaged her vagina while helping her mount a horse. She also testified that Pepcorn asked her to sit on his lap and then placed his hand on her upper thigh and then ran it up near her vagina. These incidents happened to her between the ages of seven and thirteen. Three witnesses testified to similar misconduct by Pepcorn. Two of these witnesses, also nieces of Pepcorn, testified to him touching their breasts while hugging them. One of these two also testified to Pepcorn placing his hand on her vagina and massaging it while helping her onto a horse. The third witness testifying to similar incidents as those charged was a nephew of Pepcorn's who testified that he had witnessed Pepcorn placing his hands on one of the victim's vagina while helping her onto a horse. We hold that at the time that the district court reiterated his decision on the 404(b) evidence at the pre-trial hearings, the evidence presented was relevant to show a common scheme or plan.

This holding is in line with our previous holdings in *Johnson* and *Grist* seeking to ensure that admission of evidence of uncharged misconduct in child sex crimes is treated "no differently than the admission of such evidence in other cases." *Grist,* 147 Idaho at 55, 205 P.3d at 1191. The evidence presented in this case goes well "beyond the bare fact that sexual misconduct has occurred with children in the past." *Johnson,* 148 Idaho at 668, 227 P.3d at 922. The evidence presented here shows that Pepcorn has made a conscious choice to deliberately molest or abuse

16

his wife's siblings and their children. The proffered 404(b) evidence is not used to show propensity; the common characteristics between the misconduct corroborates the presence of a definite common plan. *See id*. The admission of the testimonial evidence to sexual misconduct by multiple family members related to Pepcorn by marriage and the testimony that Pepcorn, in response to being confronted by one of the prior victims, stated that his wife's entire family "wanted it," was not in error and was relevant to prove a common scheme or plan. The admission of this evidence by the district court was not an abuse of discretion. When the evidence was presented to the district court, it recognized that its decision was discretionary, it examined and applied the governing legal standard on the record, and its decision was reached by an exercise of reason. *See Perry,* 150 Idaho at 218, 245 P.3d at 970. Therefore, we hold that the decision to allow the 404(b) evidence at Pepcorn's trial was not in error.

## IV.    CONCLUSION

The district court's decision allowing the admission of the 404(b) evidence is affirmed and Pepcorn's convictions are upheld.

Justices J. JONES, W. JONES, HORTON and STOKER, J., Pro tem, **CONCUR.**